IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| SAMUEL DAVID MOORE, JOYCE ELLEN MOORE, and THE SJM TRUST, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:09-0166 |
| | ) | Judge Trauger |
| THE WEINSTEIN COMPANY LLC, d/b/a/ DIMENSION FILMS, MGM STUDIOS, INC., GENIUS PRODUCTS, LLC, CONCORD MUSIC GROUP INC., HARVEY WEINSTEIN, and BOB WEINSTEIN, | ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

## MEMORANDUM

Pending before the court are: (1) a Motion to Dismiss for Lack of Personal Jurisdiction of

Defendants Harvey Weinstein and Bob Weinstein (Docket No. 22), (2) the defendants' Motion

to Dismiss for Failure to State a Claim (Docket No. 26), (3) the plaintiffs' Motion for Attorneys'

Fees (Docket No. 79), and (4) the plaintiffs' Motion for Leave to Amend Complaint (Docket No.

94). For the reasons discussed herein, the Weinsteins' Motion to Dismiss will be granted, and

they will be dismissed from this case; the remaining defendants' Motion to Dismiss will be

denied; the plaintiffs' Motion for Leave to Amend will be denied without prejudice; and the

plaintiffs' Motion for Attorneys' Fees will be referred to Magistrate Judge Brown for resolution.

1

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Sam Moore (professionally known as "The Legendary Soul Man Sam Moore") is a well-known entertainer and was part of the popular singing duo "Sam & Dave."[1] Plaintiff Joyce Moore is Sam Moore's wife, and plaintiff SJM Trust is a Tennessee Irrevocable Trust and is the "ultimate beneficiary of the trademarks and the rights that flow through and from the Moores." (Docket No. 1 at 2.) The defendants are various entities and individuals associated with the production and release of the motion picture *Soul Men* (the "Movie"), which was released nationally in late 2008, starring well-known actors Samuel L. Jackson and the late Bernie Mac.

The plaintiffs allege that, throughout their multi-decade performing career, Sam & Dave produced several hit songs and "developed a combination of performance style, clothing style, lifestyle, musical repertoire, physical mannerisms and personal catchphrases, the combination of which . . . became integral to the professional act and identity of" Sam Moore, the surviving member of the duo. (*Id.* at 3.) The essence of this style was "Memphis soul," and, consistent with this, Sam & Dave recorded a 1967 album titled "*Sam and Dave Soul Men,*" which included the very popular and still well-known single "*Soul Man.*" The plaintiffs claim that the success of this album and, particularly, the single, resulted in the "Sam & Dave" brand being forever linked with the "Soul Men" theme.

Sam & Dave performed together from 1961 to 1970, when they broke up following a

_____

[1]Unless otherwise noted, the facts are drawn from the plaintiffs' Complaint (Docket No. 1).

well-publicized incident of domestic violence involving Dave.  Pressured by music industry executives, the duo reunited in 1972 and performed together intermittently from 1972 to 1981, although their relationship was fractured and famously tempestuous.

In 1982, Moore married plaintiff Joyce Moore, who became his manager, and Moore overcame his addiction to drugs and began his solo career.   Moore maintains that, since this time, the term "Soul Man" or "Legendary Soul Man" or "Original Soul Man," has generally referred to Sam Moore's "entertainment services and related goods."  (*Id.*)  Indeed, where previous entertainment vehicles (such as Saturday Night Live's parody the "Blues Brothers" or a 1986 film titled *Soul Man*) have traded on the "Soul Man" theme, individuals responsible for those vehicles have secured the assistance and support of Mr. Moore.

The plaintiffs allege that, in 2003, defendants Harvey and Bob Weinstein (brothers and well-known movie producers) became very familiar with Sam Moore while producing a documentary titled "*Only the Strong Survive*" about the 1960s soul era for their former production company, Miramax.  In 2005, the Weinsteins left Miramax to start The Weinstein Company (TWC), which is also a defendant in this case.

Around February 1, 2008, Sam Moore learned from a press release issued by TWC that the Weinsteins were producing a new film titled "*Soul Men*," about a duo of African-American performers.  Specifically, the plot of the Movie is that two singers famed for songs that incorporated the "Memphis soul" sound of the 1960s and 1970s plan to stage a reunion at a musical tribute for their one-time partner, who recently died.  The duo, known as "The Real Deal," had a fractured personal relationship, but, in the course of the movie, "they reunite and

3

travel across the country and back in time, performing at different venues to relive and revive their glory days." (*Id.* at 21.) Upon reading the press release, Moore became immediately concerned that the lead characters in the Movie were "being passed off as 'Sam and Dave.'" (*Id.* at 4.)

Upon seeing the script of the Movie, Moore's concerns increased. He noticed, among other things, that music from Sam & Dave was featured in the Movie and that the Real Deal sang Sam & Dave songs (including the popular "*Hold On, I'm Comin*'") and also performed alongside individuals with whom Sam & Dave had performed. The plaintiffs claim that, as with earlier pieces that had traded on the "Soul Man" theme, Mr. Moore attempted to get involved in the production of the Movie to ensure that his reputation was not tarnished and that the facts were accurately conveyed. Indeed, in a March 3, 2008 letter, Moore, through counsel, placed TWC on notice of his concerns about the Movie. (Docket No. 1 Ex. 6.)

The defendants generally rejected Moore's concerns, claiming that the Movie was a fictional comedy and, even if the Movie was about the duo, it would be a biographical work about public figures, which would be protected by the First Amendment. (*See* Docket No. 1 Ex. 7.) The defendants also rebuffed Moore's efforts to get involved, only, at one point, offering Moore a "cameo" role, which Moore rejected as insulting.

For two, interrelated, reasons, the plaintiffs contend that the final version of the Movie justified Moore's earlier concerns that the Movie would damage Moore's reputation and legacy. First, in addition to all of the other thematic similarities discussed above, the Samuel L. Jackson character is "passed off" as Sam Moore, as he attempts to replicate Moore's singing style,

4

dancing, and manner of dress.

Second, while the Jackson character is "passed off" as Moore, he also engages in unpalatable conduct. For instance, the character frequently uses racial slurs, swears, and refers to women as "bitches." He is also a former felon and is shown brandishing a handgun during the duo's trip to the reunion concert. Additionally, the plaintiffs maintain that Jackson's performances of Sam & Dave songs are very poor, further damaging Moore's reputation.

In December 2008, a retrospective DVD, titled "*The Original Soul Men Sam & Dave*," was released by the plaintiffs in the United States. In February 2009, following its run in the theaters, the "*Soul Men*" DVD was released. The plaintiffs claim that these two DVDs competed directly with each other.

The "*Soul Men*" DVD was released by defendant Genius Products. It included an insert that notified customers that they could purchase recordings by the "Original Soul Men," on defendant Concord's "Stax Soundtrack." (Docket No. 1 at 8.) Specifically, the insert stated that "the Original Soul Men are at Stax!" (*Id.*) Concord does not own rights in Sam & Dave songs, and, therefore, the materials promoted are recordings by other artists. The plaintiffs allege that, by trading on the "Soul Man" theme, Concord "exploit[ed] the marks and professional names of" Mr. Moore "without license or authorization." (*Id.* at 29.)

On February 17, 2009, the plaintiffs filed an eight-count Complaint against all defendants alleging (1) violations of the plaintiffs' "right of publicity" under the Tennessee Personal Rights Protection Act (TPRPA), T.C.A. § 47-25-1101, *et seq*. and Tennessee common law, (2) false light invasion of privacy, (3) unfair competition under the Lanham Act, 15 U.S.C. § 1125(a), (4)

violations of the Tennessee Consumer Protection Act (TCPA), T.C.A. § 47-18-101, *et seq.*, (5) common law unfair competition, (6) unjust enrichment, (7) trademark dilution under the Lanham Act, 15 U.S.C. § 1125(c), and (8) civil conspiracy. (Docket No. 1 at 29-42.)

On April 17, 2009, the Weinsteins filed a Motion to Dismiss for Lack of Personal Jurisdiction (Docket No. 22), and all defendants filed a Motion to Dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) (Docket No. 26). The Motion to Dismiss for failure to state a claim, while fully briefed, has been held in abeyance while the plaintiffs and the Weinsteins engaged in jurisdictional discovery. (Docket No. 48). The record indicates that jurisdictional discovery has been difficult and contentious, with numerous status conferences held before Magistrate Judge Brown. On September 11, 2009, the plaintiffs filed a Motion to Compel Discovery, which was largely granted by Judge Brown. (Docket Nos. 55 and 72.) The plaintiffs' Motion for Attorneys' Fees seeks fees associated with that Motion to Compel. (Docket No. 79.)

The parties have only recently finished jurisdictional discovery and supplemental briefing on the personal jurisdiction issue. (Docket No. 88.) On March 16, 2010, the plaintiffs filed their Motion for Leave to Amend, which attaches a proposed Amended Complaint. (Docket No. 94.) This Amended Complaint would only add statements justifying personal jurisdiction over the various defendants, including the Weinsteins. (Docket No. 94 Ex. A.) On April 29, 2010, Judge Echols recused himself in this case, and it was assigned to this judge. (Docket No. 108.)

6

<u>ANALYSIS</u>

The plaintiffs have filed an eight-count Complaint against various entities associated with the major motion picture *"Soul Men*." The movie's executive producers, Harvey and Bob Weinstein, have moved to dismiss the Complaint on personal jurisdiction grounds, and they also join the remaining defendants in seeking to dismiss the Complaint for failure to state a claim. The plaintiffs maintain that there is personal jurisdiction over the Weinsteins in Tennessee and that the Complaint validly states a claim on all eight counts.

**I.      Personal Jurisdiction Over the Weinsteins**

**A.      Legal Standard**

While the corporate defendants do not challenge that they are subject to personal jurisdiction in Tennessee, the Weinsteins contend that they lack sufficient contacts with Tennessee to be subject to personal jurisdiction here. (Docket No. 23.)

A court deciding a motion to dismiss for lack of personal jurisdiction has three options. It may (1) rule on the motion on the basis of the affidavits submitted by the parties, (2) permit discovery in aid of the motion, or (3) conduct an evidentiary hearing on the merits of the motion. *See Dean v. Motel 6 Operating LP*, 134 F.3d 1269, 1272 (6th Cir. 1998). Here, discovery in aid of the motion was conducted, but there has not been an evidentiary hearing. In this circumstance, if there is a genuine dispute about the jurisdictional facts, the party asserting jurisdiction need only make a *prima facie* showing of jurisdiction to defeat the motion. *Id.* If, as here, there is no "real dispute" about the facts, the party asserting jurisdiction must show

7

jurisdiction by a "preponderance of the evidence." *Id.*[2]

As the parties recognize, the issue of whether this court may exercise personal jurisdiction over the Weinsteins depends on the specific limitations of Tennessee's long-arm statute and the constitutional principles of due process. *Thomson v. Toyota Motor Corp.*, 545 F.3d 357, 361 (6th Cir. 2008). Tennessee's long-arm statute has been consistently construed to extend to the limits of federal due process, and, therefore, the two inquiries are merged, and the court need only determine whether exercising personal jurisdiction over these defendants is consistent with federal due process requirements. *Bridgeport Music, Inc. v. Still N The Water Publishing*, 327 F.3d 472, 477 (6th Cir. 2003).

In order for due process to permit the exercise of personal jurisdiction over a non-resident defendant, the defendant must have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Youn v. Track, Inc.*, 324 F.3d 409, 417-18 (6th Cir. 2003)(quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The Supreme Court has identified "general" jurisdiction and "specific" jurisdiction as distinct bases for personal jurisdiction. A demonstration of the contacts

---

[2] The plaintiffs have attempted to raise a dispute about the jurisdictional facts primarily through the declaration of Ms. Moore. (Docket No. 98.) Ms. Moore states that the Weinsteins, acting through their employees, contacted her in Tennessee and that the Weinsteins "decided" to film a portion of the Movie in Tennessee to provide more authenticity. (*Id.*) The defendants rightly challenge many of the assertions in the declaration as irrelevant to whether there is personal jurisdiction over the Weinsteins (as opposed to the corporate entities) and on the basis that the assertions are not supported by personal knowledge. For instance, there is no indication as to how Ms. Moore would know who made the decisions about how to proceed with the Movie or on what basis. As can be seen herein, there is no "real dispute" about the Weinsteins' contacts with Tennessee, and, therefore, the preponderance of the evidence standard is the appropriate one to apply.

8

necessary for either basis is sufficient to establish personal jurisdiction. *Id.*

Specific jurisdiction exists when a state exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum. *Id.* General jurisdiction, on the other hand, exists when a defendant's contacts with the forum are "substantial" and "continuous and systematic." *Id.* When personal jurisdiction is based upon general jurisdiction, a state may exercise jurisdiction over a defendant, even if the suit does not arise out of the defendant's contacts with the state.[3] *Id.*

In *Southern Machine Co. v. Mohasco Industries, Inc.*, the Sixth Circuit established a three-part test for determining whether the exercise of specific jurisdiction was consistent with the principles of due process. "First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." 401 F.2d 374, 381 (6th Cir. 1968). While a motion to dismiss for lack of specific personal jurisdiction may be maintained based on prongs two and three of the *Mohasco* test, purposeful availment is the *sine qua non*, or absolutely indispensable, element of personal jurisdiction, and, therefore, disputes

---

[3]Here, the court finds no basis for general jurisdiction over the Weinsteins. The plaintiffs' entire argument in support of general jurisdiction is based upon the conduct of TWC, that is, TWC (chaired by the Weinsteins) releases movies and television shows in Tennessee. (Docket No. 96 at 10-12.) There is no indication that the Weinsteins have contacts with Tennessee that would make them subject to general jurisdiction, and, as discussed below, individual corporate officers are not subject to personal jurisdiction simply because their company is so subject. Therefore, the court focuses its analysis on the specific jurisdiction issue.

9

about whether or not there is specific personal jurisdiction in a given case often rise or fall on the issue of purposeful availment. *See Air Products and Controls, Inc. v. Safetech International, Inc.*, 503 F.3d 544, 550-51 (6th Cir. 2007).

As both parties recognize, this case raises issues under the "fiduciary shield" doctrine. Under this doctrine, personal jurisdiction over individual corporate officers such as the Weinsteins "cannot be predicated merely upon jurisdiction over the corporation." *Balance Dynamics Corp. v. Schmitt Industries*, 204 F.3d 683, 697-98 (6th Cir. 2000). Rather, to establish personal jurisdiction over a corporate officer under the circumstances here, the plaintiffs must show that the corporate officer was "actively and personally involved in the conduct giving rise to the claim," and, if this is shown, "the exercise of personal jurisdiction . . . depend[s] on traditional notions of fair play and substantial justice; *i.e.*, whether she purposely availed herself of the forum and the reasonably foreseeable consequences of that availment." *Id.*

### B.  Application

In the Weinsteins' initial motion, they argued that they had "essentially no contacts" with Tennessee, that is, they do not live or work in Tennessee, own property in Tennessee, or direct business to Tennessee. (Docket No. 23 at 5-11.) While they recognized that they were executive producers of "*Soul Men*," and the cast and crew spent four days (of forty total filming days) filming in Memphis, they claimed that all of their activities relating to the Movie occurred outside of Tennessee. (*Id.*) That is, they never "entered the State of Tennessee to produce the Movie" and "never directed any telephone calls or [faxes] to persons in the State of Tennessee in connection with their involvement with the Movie." (*Id.*) On this basis, the Weinsteins argued

10

that the plaintiffs did not come close to demonstrating personal jurisdiction.

After lengthy and difficult jurisdictional discovery (which included depositions of the Weinsteins), the plaintiffs submitted their response, which largely relies upon deposition testimony from the Weinsteins. In his deposition, Bob Weinstein testified that, from his office outside of the state of Tennessee, he viewed the pieces of the daily filming that were sent to him by the director. (Docket No. 97 Ex. H at 102, 106.) Bob Weinstein testified that he specifically remembered viewing a scene involving the famous ducks at the Peabody Hotel, which was shot in Memphis.[4] (*Id.* at 108-110.)

The plaintiffs also provide an e-mail dated January 15, 2008 (prior to the start of filming) from Moore's friend Roger Friedman to Harvey Weinstein, which stated that Moore was "rightly panicked" about the Movie, because "Soul Man . . . sum[s] up" Moore's "whole life" and, if Moore is "not in the movie substantially and part of the whole deal, it's very bad for him in every way." (Docket No. 97 Ex. E.) Harvey Weinstein forwarded this e-mail to his brother with the note, "Dear Bob, You have to have Sam participate in this movie." (*Id.*)

The plaintiffs argue that, given that Bob Weinstein viewed these "classic Tennessee" scenes while on notice of Sam Moore's concerns, the Weinsteins should have "reasonably anticipated" being haled into court here under the three-part specific jurisdiction test. (Docket No. 96 at 8.) Specifically, the "actual knowledge that the movie was being filmed in Tennessee"

---

[4] The plaintiffs also point out that discovery revealed that Bob Weinstein was involved in the casting, financing, marketing, and other major decisions surrounding the production of the Movie and argue that the case for personal jurisdiction is strengthened by the fact that TWC employees obtained permits, closed streets, rented hotel rooms and hired extras in Tennessee, along with marketing and distributing the Movie there. (*Id.* at 2.)

demonstrates purposeful availment. (*Id.* at 18.) As for the rest of the specific jurisdiction test, the plaintiffs claim that, because the infringement of the plaintiffs' rights occurred in Tennessee, the claims "arise from" the activities of the defendants in the forum state, and, in light of all of this, it is "reasonable" for the Weinsteins to be sued here. (*Id.* at 19-22.)

Moreover, the plaintiffs argue that the Weinsteins are not protected by the "fiduciary shield" doctrine because they were "actively and personally involved in the conduct giving rise to the claims." (*Id.* at 14.) That is, they ultimately controlled all operations at TWC, oversaw and produced the Movie, and made major decisions regarding its direction. (*Id.*)

The plaintiffs have shown that the Weinsteins are not protected by the "fiduciary shield" doctrine, because they were "actively and personally involved" in the conduct giving rise to the claim; that is, they were the executive producers of the Movie at issue here, and the plaintiffs contend that the making and distributing of the Movie violated their rights. However, the plaintiffs still must show "purposeful availment" *on the part of the Weinsteins*, separate and apart from the conduct of TWC, and this they cannot show.

Before a defendant may be sued in a forum, the defendant must "purposefully avail" himself of the "privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)(internal citation and quotation omitted). This "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Id.*

Purposeful availment is "something akin to a deliberate undertaking," that is, a deliberate

effort by the defendant to direct its activities toward, and to make contact with, the forum. *Bridgeport Music*, 327 F.3d at 478 (internal quotation omitted). Purposeful availment exists "when the defendant's contacts with the forum state proximately result from actions by the defendant *himself* that create a substantial connection with the forum state, and when the defendant's conduct and connection with the forum are such that he should reasonably anticipate being haled into court there." *Id.* (internal quotation omitted).

The record demonstrates that Bob Weinstein was primarily involved in the actual work of producing the Movie while Harvey Weinstein was not. Indeed, Harvey Weinstein testified that the Movie was Bob Weinstein's film, and, while the brothers shared a credit on the film, Harvey Weinstein had "no responsibility" for it. (*See* Docket No. 97 Ex. G at 57, 103-104.) While it is undisputed that Harvey Weinstein's company (TWC) is subject to jurisdiction in Tennessee, there is nothing in the record to suggest that, individually, Harvey Weinstein did anything to purposefully avail himself of the privilege of doing business in Tennessee. Therefore, he is entitled to be dismissed from this case.

The record shows that Bob Weinstein had a key oversight role in making the Movie. That said, there is scant evidence that Bob Weinstein's activities in regards to the Movie demonstrate purposeful availment. Bob Weinstein testified that he watched the daily filming excerpts and made key hiring and financing decisions, all from outside of Tennessee. Other major "day to day" decisions regarding how the Movie would be crafted, managed, and shot were not made by Weinstein, but were made by "principles" whom Weinstein hired, such as the director. (Docket No. 97 Ex. H at 136.) This means that Weinstein's connection with Tennessee

13

was, at best, tenuous and passive. For instance, Weinstein testified that he did not know where the director of the film was located when he talked to him or whether, aside from the scene shot at the Peabody Hotel, a particular scene was shot in Tennessee. (*Id.* at 110.) Additionally, Matt Stein, who worked with Bob Weinstein at TWC, testified that Weinstein and other principles at TWC did not want to film in Tennessee, but doing so was a concession to the director of the Movie and other producers/investors. (Docket No. 97 Ex. J at 31-32.)

In sum, jurisdictional discovery has revealed that Bob Weinstein reluctantly gave permission to film a small part of the Movie in Tennessee and was generally aware that some of the Movie was being shot in Tennessee around the same time that it was happening. To the court, this relatively passive conduct is not the type of "deliberate undertaking" that is consistent with purposeful availment. As there is insufficient evidence that the Weinsteins purposefully availed themselves of the privilege of doing business in Tennessee, the claims against them in this case will be dismissed.[5]

_____

[5]As noted above, the plaintiffs also have moved for attorneys' fees, as they prevailed (in large part) on a Motion to Compel in the course of jurisdictional discovery. (Docket No. 80 at 4.) The docket and briefing for the motion for fees indicates that Magistrate Judge Brown became very familiar with the facts of this discovery dispute and the parties' conduct. Therefore, he is in a better position than this court to analyze the merits of each party's position on the motion for fees, and that motion will be referred to him for disposition.

Also, the plaintiffs have moved for leave to amend their Complaint to add personal jurisdiction allegations against various defendants, including the Weinsteins. As to the Weinsteins, the Amended Complaint reiterates the personal jurisdiction allegations made in supplemental briefing and does not add any substantive allegations not already discussed herein. (Docket No. 94 Ex. A at 12-14.) Given that the court is, through this Memorandum and accompanying Order, dismissing the claims against the Weinsteins, it is not appropriate for the court to grant a motion for leave that would allow the plaintiffs to file an Amended Complaint that names the Weinsteins as defendants. Therefore, the plaintiffs' Motion for Leave will be denied; the plaintiffs may file a motion for leave to file an Amended Complaint that does not

## II. Failure to State a Claim

The remaining defendants assert two grounds for dismissal of the plaintiffs' claims under Fed. R. Civ. P. 12(b)(6). First, the defendants argue that all claims (aside from the invasion of privacy claim) are barred by the First Amendment. (Docket No. 27 at 6.) Second, the defendants contend that several of the claims, including the invasion of privacy claim, are barred by the applicable statute of limitations.

### A. Standard of Review

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)(2)). The court must determine whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on

name the Weinsteins, if they choose.

"legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1949-50 (2009).

### B.     Statute of Limitations

The defendants' statute of limitations argument is without merit.  Neither side disputes that Tennessee's statute of limitations and "discovery rule" apply to the plaintiffs' claims and, therefore, the "clock begins to run" on the plaintiffs' claims "when the injury is discovered, or in the exercise of reasonable care and diligence, the injury should have been discovered." *Quality Auto Parts Co., Inc. v. Bluff City Buick Co, Inc.*, 876 S.W. 2d 818, 820 (Tenn. 1994).  Under the facts alleged in the Complaint, only those claims governed by a one-year statute of limitations are endangered, because the plaintiffs allege that Moore did not even become aware of plans for the Movie until February 1, 2008, and the Complaint was filed on February 17, 2009.  (Docket No. 1 at 20.)

The court, however, is persuaded by the plaintiffs' argument that the statute of limitations should not be deemed to have started to run until the Movie was released in late 2008, because "changes from the original script" occur throughout the movie-making process, and, therefore, the plaintiff could not have been reasonably aware that he was injured by the Movie until it was released in final form.  (Docket No. 40 at 27)(citing *Miller v. Miramax Film Corp*., 2001 U.S. Dist. LEXIS 25967, *39 (C.D. Cal. Sept 26, 2001), which concluded that the statute of limitations did not begin when the plaintiff first sent "cease and desist" letters to the makers of

16

"*Shakespeare in Love*," but, rather, the clock began to run once the movie was released). The defendants come forth with no authority from the film production context that is at odds with the sound logic of *Miller* and, therefore, the court finds that the claims in this case were timely filed.[6]

### C. The First Amendment

### I. Unfair Competition under the Lanham Act

The defendants begin their First Amendment argument by focusing on Count III, which alleges "unfair competition" under the Lanham Act, 15 U.S.C. § 1125(a).[7] In Count III, the plaintiffs allege that the Movie (along with its DVD and the Concord insert/soundtrack, collectively the "Movie-related" products) are "confusingly similar" and "closely related" to

---

[6]The defendants point to a footnote in the March 3, 2008 letter (attached to the Complaint) in which Moore's counsel states that, even if the defendants changed the title of the Movie, "the damage [to Moore's reputation] has already been done" through pre-production publicity. (Docket No. 1 Ex. 6.) While the letter takes a hard tone at times, it also indicates that the plaintiffs were willing to negotiate and had concluded that the "appropriate time" to file suit had not been reached. (*Id.* at 4.) Again, given the nature of the claims and the industry at issue, the most reasonable time to conclude that the claims accrued is when the Movie was released.

[7] Section 1125(a) states: "Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which – (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

those items associated with "common law trademark" in "Soul Man" and "Soul Men" established by Mr. Moore. (Docket No. 1 at 33-35.) The plaintiffs allege that, by putting these items in a common marketplace with the plaintiffs' materials (specifically the 1967 album and the 2008 DVD), the defendants have created a situation in which the consuming public is likely to be confused and given the false impression that the Movie-related products are associated with the plaintiffs. (*Id.* at 35-37.)

For purposes of this motion only, the defendants accept the premise (that they clearly find dubious) that the "plaintiffs could demonstrate common law ownership" of the "Soul Men" and "Soul Man" marks. (Docket No. 27 at 7.) The defendants also recognize that, in a typical unfair competition claim under the Lanham Act, the plaintiffs must show (1) ownership of the mark and (2) "likelihood of confusion" among the relevant customers, that is, that "the defendants' use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." (*Id.* at 8)(citing *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 280 (6th Cir. 1997)). However, the defendants argue that, where, as here, the mark is used in an "expressive work," such as the Movie-related products, that use receives additional protection under the First Amendment.

Indeed, it is well settled that, in the "expressive work" context, the plaintiff must show that the defendant's use of the mark does not just confuse but "explicitly misleads as to the source or the content of the work." *See Parks v. LaFace Records*, 329 F.3d 437, 451-52 (6th Cir. 2003); *ETW Corp v. Jireh Publishing, Inc.*, 332 F.3d 915, 924-28 (6th Cir. 2003). The Sixth Circuit has adopted the *Rogers* test, which holds that, unless the use of the mark "has no artistic

18

relevance to the underlying work whatsoever, or, if it has some artistic relevance, . . . unless [the use] explicitly misleads as to the source or the content of the work," the use is protected. *Id; Rogers v. Grimaldi*, 875 F.2d 994, 999 (2nd Cir. 1989).

In *ETW*, the licensing agent of golfer Tiger Woods sued the publisher of a painting titled "The Masters of Augusta," which included depictions of Woods playing at the Masters Golf Tournament in Augusta, Georgia. 332 F.3d at 918-19. Also included with the painting were an envelope and a narrative description of the 1997 Masters that, on three occasions, used the words "Tiger Woods," a phrase in which ETW owned a federally registered trademark. *Id.* at 919. The Sixth Circuit rejected the Section 1125(a) claim in that case, finding, among other things, that the artist's use of Woods's image and name was artistically relevant to the underlying work and did not explicitly mislead as to the source of the work. *Id.* at 921, 937. Indeed, absent any "explicit indication [of misleading] on the face of the" relevant materials, the interests of artistic expression "preclude application of the [Lanham] Act." *Id.*

The defendants argue that, under *ETW*, Count III is clearly not viable. That is, the use of the term "Soul Men" in the Movie-related products is artistically relevant to those materials, which are concerned with soul singers. (Docket No. 27 at 12.) Also, because there is nothing in the Movie-related products that "explicitly misleads" one to think that Sam Moore endorsed or was associated with those materials, the plaintiffs cannot prevail under the *Rogers* test. (*Id.* at 12-13.)

In response, the plaintiffs argue that a footnote in *Rogers* provides a clear basis for Section 1125(a) relief – that is, the *Rogers* test does not apply "to misleading titles that are

confusingly similar to other titles." (Docket No. 40 at 6)(quoting *Rogers*, 875 F.2d at 999 n.5.)

That is, by titling the Movie "*Soul Men*," the defendants have confusingly titled their work in

regards to the plaintiffs' 1967 album "*Sam and Dave Soul Men*" and the 2008 DVD "*The*

*Original Soul Men*." The plaintiffs argue that, at least for this aspect of the case, under the

footnote in *Rogers,* the likelihood of confusion standard is appropriate, and, therefore, dismissal

is not proper. (*Id* at 10-11.)

        While the plaintiffs maintain that the Sixth Circuit "has not addressed a case concerning

the use of two competing artistic titles," they point to five cases from district courts in California

and New York that have concluded, implicitly or explicitly, that *Rogers* does not offer any

additional protection where an alleged infringer has titled his artistic piece similarly to the

plaintiff, and, in that circumstance, the basic "likelihood of confusion" test should apply. (*Id.*)[8]

        In their Reply, the defendants argue that "the competing titles exception to *Rogers* does

not apply." (Docket No. 43 at 7.) In support, the defendants simply claim that "this case is not

about" competing titles, but, as indicated in the Complaint, "the crux of Plaintiffs' claims lies in

allegations of Defendants' purported use of Mr. Moore's 'professional stage name' and his

celebrity 'persona' in the title of the Movie, which he alleges was a false and misleading 'life

_____

        [8]*See Morgan Creek Productions v. Capital Cites/ABC, Inc.*, 1991 U.S. Dist. LEXIS
20564, *12, 24 (C.D. Cal. Oct. 26, 1991)("The Young Riders" versus "The Young Guns");
*Simon & Schuster v. Dove Audio*, 970 F. Supp. 279, 296 (S.D.N.Y. 1997)("The Children's Book
of Virtues" versus "The Book of Virtues"); *Toho Co., Ltd. v. William Morrow & Co.*, 33 F.
Supp. 2d 1206, 1212 (C.D. Cal 1998)(GODZILLA versus "Godzilla!"); *Apollo Theater
Foundation, Inc. v. W. International Syndication*, 2005 U.S. Dist. LEXIS 7955, *49-50
(S.D.N.Y. May 6, 2005)("Showtime" and "Showtime in Harlem" versus "Showtime at the
Apollo"); *Tri-Star Pictures, Inc. v. Leisure Time Prods.*, 749 F. Supp. 1243, 1253 (S.D.N.Y.
1990)("Return From the River Kwai" versus "Bridge on the River Kwai").

20

story' about the musical duo 'Sam & Dave.'" (*Id.*)

Absent the argument about "competing titles," the court might be inclined to dismiss Count III. It appears very unlikely, and, perhaps, "facially implausible," that the defendants' use of the term "Soul Men" is not artistically relevant or that it "explicitly misleads" the consumer as to the source of the mark. It appears from the Complaint and related materials that there is no allegation that any of the materials makes explicit reference to Mr. Moore, and, therefore, satisfying the high bar set by *Rogers* would be very difficult.

That said, the "competing titles" argument validates the claim. The plaintiffs have alleged that, over the years, they introduced an album and a DVD into the marketplace, both of which were titled with the plaintiffs' "Soul Men" mark and which competed with the defendants' Movie-related products, which bore a similar title. Supported by a significant amount of case law, the plaintiffs maintain that they only need to establish that, in addition to owning the "Soul Man" mark, the public is likely to be confused by the similarity in the titles of the works at issue. The defendants' only response is to weakly claim that "competing titles" is not "what this case is about." The defendants have not shown that the "competing titles" aspect of Count III is "facially implausible" and, therefore, the court will not dismiss Count III.[9]

---

[9] Based upon the court's reading, the plaintiffs' Count III claim against Concord is likely foreclosed by *ETW*, which indicates that the use of a mark in promoting or enhancing an expressive work is protected by the First Amendment. Moreover, it does not appear, based upon the record to this point, that Concord would be subject to a "competing titles" argument. The defendants, however, have not attempted to differentiate between the defendants here, and their strategy, seen below, of arguing that failure on the Lanham Act claims automatically results in dismissal of the other claims, leaves the court somewhat at sea as to how to consider the claims against Concord. Summary judgment is the appropriate stage for Concord to more specifically address why it should be dismissed from this case.

### ii.     Lanham Act trademark dilution (Count VII)

The defendants argue that the plaintiffs' trademark dilution claim fails because the Movie-related products are not "purely commercial speech"; that is, they do more than "propose a commercial transaction" and, as a basic proposition, "an action for dilution can only be maintained where the use is limited to purely commercial speech."  (Docket No. 27 at 14)(citing *Mattel Inc. v. MCA Records*, 296 F.3d at 894, 906 (9th Cir. 2002)).  The plaintiffs respond to this "terse argument" by stating that "the court must balance the right of the trademark owner against interests of free speech."  (Docket No. 40 at 16.)

Both parties overlook the discussion of dilution in *ETW*.  There, the court concluded that the painting and related materials were not commercial speech because they did not propose a commercial transaction.  *ETW*, 332 F.3d at 925.  The dilution claim was limited to the use of the phrase "Tiger Woods," with the majority opinion concluding that the "fair use" doctrine precluded success for the plaintiff on the dilution claim.  *Id.* at 923.  Therefore, in *ETW*, the Sixth Circuit had an opportunity to limit dilution claims to pure commercial speech, and they did not do so.  Therefore, the lone ground asserted by the defendants to dismiss this claim is not viable, and the claim will not be dismissed.

### iii.     Common law unfair competition and TCPA claim (Counts IV-V)

The defendants point out that the plaintiffs' unfair competition and TCPA claims are based upon "the same nexus of facts" as the Lanham Act claims discussed above. (Docket No. 27 at 15.)  The defendants quote *McDonald's Corp. v. Shop At Home*, 82 F. Supp,.2d 801, 816 (M.D. Tenn. 2000)(Trauger, J) for the statement that "the same analysis that applies to the

federal Lanham Act claims also applies to the state claims of unfair competition under Tennessee common law and of violations of the [TCPA]." (*Id.* at 16.) Arguing that the plaintiffs' Lanham Act claims are unsustainable based upon its arguments above, the defendants argue that these claims should be dismissed as well. (*Id.*)

The plaintiffs note that, in *Brainard v. Vassar*, 561 F. Supp.2d 922, 936 (M.D. Tenn. 2008)(Trauger, J), this court stated that "[t]he language in *McDonald's Corp.* does not necessarily indicate that the tort of unfair competition under Tennessee common law is limited, in all aspects, to the scope of the Lanham Act"; rather, it merely indicated that the "likelihood of confusion" analysis is usually central in analyzing state law unfair competition claims, just as it is in Lanham Act claims. (Docket No. 40 at 18.) Moreover, in *Brainard*, the court indicated that the parameters of the tort of unfair competition in Tennessee are somewhat unsettled, but the situation in which the defendant "passes off" the plaintiff's product as his own certainly falls within those parameters. 561 F. Supp. 2d at 937.

The plaintiffs also argue that they "have sufficiently pled all elements of the claim[] against Defendants under . . . the [TCPA]." (*Id.*) Indeed, the TCPA prohibits "[c]ausing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services," as well as any "deceptive" practices directed toward the consumer. T.C.A. § 47-18-104.

As indicated by *Brainard*, the court in *McDonald's* did not state that "as go the Lanham Act claims, so go the state law claims." The plaintiffs have alleged an array of deceptive and unfair conduct and competition, and they are entitled to discovery, which will likely reveal the

23

merit of those allegations. After that discovery, it will be much clearer whether the plaintiffs have viable claims here.

###       iv.       Right of publicity (Count I)

The defendants also moved to dismiss the plaintiffs' "right of publicity" claim. (Docket No. 27 at 16.) Tennessee recognizes the right of publicity in the TPRPA, which prohibits the unauthorized use of another's name or likeness "as an item of commerce for purposes of advertising products, merchandise, goods, or services, or for purposes of . . . solicitation of . . . purchases of products, merchandise, goods or services." T.C.A. § 47-25-1105(a). The case law makes clear that the statute creates a property right "in the use of one's name, photograph or likeness."[10] *Polygram Records, Inc. v. Legacy Entertainment Group, LLC*, 205 S.W.3d 439, 445 (Tenn. Ct. App. 2006).

The defendants claim that the First Amendment precludes the right of publicity action here. The defendants provide a lengthy discussion of mostly non-controlling case law and Restatement authority that roughly stands for the proposition that using a person's likeness does not violate the right of publicity if the use is in conjunction with expressing ideas under the First Amendment. Indeed, the TPRPA includes a "fair use defense" for situations in which the "use of a name, photograph, or likeness is in connection with any news, public affairs, or sports

_____

[10] The defendants suggest that, perhaps, the Arizona "right of publicity" law should govern because the individual plaintiffs are residents of Arizona. (Docket No. 27 at 16-17.) The plaintiffs respond that the presence of the Tennessee trust dictates that Tennessee law applies. (Docket No. 40 at 18.) The defendants do not suggest that the result is determined by the law applied and maintain that a choice-of-law analysis is not necessary at this time. The defendants are correct that this analysis need not take place at this juncture. (Docket No. 27 at 17.)

broadcast or account." T.C.A. § 47-25-1107; *see also Ruffin-Steinbeck v. dePasse*, 267 F.3d 457, 461-62 (6th Cir. 2001).

Then, the defendants go on to assume that the Movie is a life story about Mr. Moore, and is, therefore, protected by the First Amendment. *dePasse*, 267 F.3d at 461-62 (finding that a fictionalized depiction of the musical group "The Temptations" in a television miniseries was protected by the First Amendment, as was advertising incidental to the production).

This case law (and the statute) stands for the proposition that, when a likeness is exploited in the entertainment context, the court must balance the First Amendment interests with the individual's interest in protecting his or her property right. *See Apple Corps Ltd. v. ADPR, Inc.*, 843 F. Supp at 342, 346 (M.D. Tenn. 1993)("First Amendment rights are not absolute. In certain circumstances, the interests protected by the First Amendment will inevitably conflict with another individual's right of publicity"); *Bosley v. WildWetT.com*, 310 F. Supp. 2d 914, 926 (N.D. Ohio 2004)("the First Amendment values of free speech are balanced on a case-by-case basis against the right of publicity values")(internal quotation omitted). Therefore, it is not enough for the defendants to simply assume that a "life story" about Mr. Moore would be protected speech. The plaintiffs do not allege that the defendants have told Moore's life story; rather they allege that, through the Movie-related products, they have exploited and distorted Moore's image for commercial gain. In light of this more nuanced reality, additional discovery and fact gathering is necessary to determine if the plaintiffs' rights under the TPRPA were violated or whether the defendants' use of any likenesses of Mr. Moore is protected by the First Amendment.

25

### v. Unjust enrichment and conspiracy (Counts VI and VIII)

The defendants' one-page argument in support of dismissal of these claims is entirely premised upon the notion that these claims arise from the same facts as the other claims, and, because those claims were subject to dismissal, these claims should be as well. (Docket No. 27 at 20; Docket No. 43 at 12.) The plaintiffs respond that they have properly stated a claim under both counts. (Docket No. 40 at 23.) As the underlying premise of the defendants' argument is incorrect, the court will not dismiss counts VI and VIII.

### CONCLUSION

For the reasons expressed herein, the claims against the Weinsteins will be dismissed for lack of personal jurisdiction. The remaining defendants' motion to dismiss will be denied. The plaintiffs' Motion for Leave to Amend will be denied without prejudice, and the Motion for Attorneys' Fees will be referred to Judge Brown.

ALETA A. TRAUGER
United States District Judge