# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| SAMUEL DAVID MOORE, JOYCE ELLEN MOORE, and THE SJM TRUST,<br><br>    Plaintiffs,<br><br>v.<br><br>THE WEINSTEIN COMPANY, LLC, doing business as DIMENSION FILMS; METRO-GOLDWYN-MAYER STUDIOS, INC.; GENIUS PRODUCTS, LLC; and CONCORD MUSIC GROUP, INC.,<br><br>    Defendants, | )<br>)<br>)<br>)<br>)   **Case No. 3:09-CV-00166**<br>)<br>)   **Judge Aleta A. Trauger**<br>)   **Magistrate Judge Brown**<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM

Pending before the court are a series of related motions. The defendants filed a Motion for Summary Judgment (Docket No. 303), to which the plaintiffs filed a Response in opposition (Docket No. 340), and the defendants filed a Reply (Docket No. 358). In support of their Response, the plaintiffs rely upon the Expert Report of John Simson (Docket No. 342, Ex. 10), the Expert Report of Peter Benjaminson (*id.*, Ex. 14), the Expert Declaration of Anne Chasser (*id.*, Ex. 36), and the Declaration of Plaintiff Joyce Ellen Moore in rebuttal to the defendants' Motion for Summary Judgment (*id.*, Ex. 1) ("Joyce Moore Rebuttal Declaration"). Concurrently with their Motion for Summary Judgment, the defendants filed a Motion to Exclude the Report and Testimony of Simson (Docket No. 298) and a Motion to Exclude the Report and Testimony of Benjaminson (Docket No. 300), to which the plaintiffs filed Responses in opposition (Docket Nos. 327 (Simson) and 326 (Benjaminson)), and the defendants filed Replies (Docket Nos. 335 (Simson) and 334 (Benjaminson)). Also, in response to the plaintiffs' opposition to the Motion

for Summary Judgment and concurrent with filing its Reply with respect thereto, the defendants filed a Motion to Strike the Chasser Declaration (Docket No. 354) and a Motion to Strike the Joyce Moore Rebuttal Declaration (Docket No. 355), to which the plaintiffs filed Responses in opposition (Docket Nos. 366 (Chasser) and 362 (Moore)), and the defendants filed Replies (Docket Nos. 372 (Chasser) and 369 (Moore)).

For the reasons stated herein, the Motion to Exclude the Simson Report and Testimony will be granted, the Motion to Exclude the Benjaminson Report and Testimony will be granted, the Motion to Exclude the Chasser Declaration will be granted in part and denied in part, the Motion to Strike the Joyce Moore Rebuttal Declaration will be granted in part and denied in part, and the Motion for Summary Judgment will be granted.

## OVERVIEW AND PROCEDURAL HISTORY

### I.     Overview

Plaintiff Samuel David Moore is a musical entertainer who is most famous for performing the songs "Soul Man" and "Hold On I'm Comin'" with Dave Prater, as part of the "Sam & Dave" soul music duo in the 1960's and 1970's. Although "Sam & Dave" ceased performing together by the early 1980's and Prater died in 1988, Sam Moore continues to perform and to make celebrity appearances, in which he is often referred to as "Sam Moore 'The Legendary Soul Man'" or some variation thereof.

Sam Moore claims to possess intellectual property rights in certain unregistered trademarks, including the terms "Soul Man," "Soul Men," "The Legendary Soul Man," and "The Original Soul Man" and "The Original Soul Men" (collectively, "Marks"). Sam Moore also asserts claims relative to his 1967 album "Sam & Dave Soul Men" and a 2008 documentary

concerning Sam & Dave.

In 2008, defendant The Weinstein Company, LLC d/b/a Dimension Films ("TWC") released a feature film called *Soul Men* (hereinafter "*Soul Men*" or "Movie") starring Samuel L. Jackson and Bernie Mac. Pursuant to contractual agreements with TWC and/or its affiliates, defendant Metro-Goldwyn Mayer Studios, Inc. ("MGM") distributed *Soul Men* in theaters nationwide, defendant Genius Products, LLC ("Genius Products") has distributed a DVD version of the Movie, and Concord Music Group, Inc. ("Concord") created and distributes the Movie's soundtrack, entitled *Soul Men The Original Motion Picture Soundtrack* ("Soundtrack").

In this lawsuit, Sam Moore, his wife Joyce Ellen Moore, and The SJM Trust (collectively, "plaintiffs") broadly contend that the defendants violated their intellectual property, publicity, and privacy rights by producing, promoting, and/or distributing the Movie and the Soundtrack. The plaintiffs assert the following claims:

(1)     violation of the "right of publicity" under the Tennessee Personal Rights Protection Act ("TPRPA"), Tenn Code Ann. § 47-25-1101 *et seq.* (2012), and Tennessee common law (Count I),

(2)     false light invasion of privacy (Count II);

(3)     unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (2012) (Count III);

(4)     violations of the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-101 *et seq.* (2012) (Count IV);

(5)     common law unfair competition (Count V);

(6)     unjust enrichment (Count VI);

(7)     trademark dilution under § 43(c) the Lanham Act, 15 U.S.C. § 1125(c) (Count VII);

(8)     civil conspiracy (Count VIII); and

3

(9)     trademark dilution in violation of the Tennessee Trade Mark Act
        ("TTMA"), Tenn. Code Ann. § 47-25-513 (2012) (Count IX).

(*See* Docket No. 146, First Am. Compl. ¶¶ 88-172.)

## II.     Procedural History

On May 12, 2010, this court denied the defendants' Motion to Dismiss (Docket Nos. 112 (Memorandum) and 113 (Order)),[1] after which the parties engaged in a protracted and contentious discovery process.  Pursuant to this court's May 11, 2012 Memorandum and associated Order (Docket Nos. 373 and 374), the First Amended Complaint remains the operative complaint in the case, and the defendants are entitled to an adverse inference that the plaintiffs have never received income for or related to any purported trademarks, rights of publicity, or other rights asserted in this lawsuit.

In support of their Motion for Summary Judgment, the defendants filed a Memorandum of Law (Docket No. 306 (sealed) and 317 (redacted and unsealed)) ("Defs. SJ Mem."), a Declaration of Robb Harvey with attached exhibits (Docket No. 302), the Defendants' Statement of Undisputed Facts with 50 attached exhibits (Docket Nos. 308 (sealed) and 322 (unsealed)[2]) ("DSUF"), and a Notice of Filing that attached three unreported cases (Docket No. 309).

In opposition to the Motion for Summary Judgment, the plaintiffs filed a Memorandum of Law (Docket No. 340 (sealed)) ("Pltfs. SJ Resp.") and Plaintiffs' Responses to the DSUF with

---

[1]On that date, the court also granted a separate Motion to Dismiss by then-defendants Harvey Weinstein and Bob Weinstein, who had been named in their personal capacities, for lack of personal jurisdiction.  (*See* Docket No. 112 at p. 14.)

[2]The defendants originally submitted the redacted version of Defendants' Statement of Undisputed Facts at Docket No. 320, but did not include the required exhibit designations.  After notice from the docket clerk, the defendants re-submitted the materials with appropriate designations at Docket No. 322.  These two docket entries are otherwise identical.

36 attached exhibits (Docket No. 342) ("PRDSUF").[3]  The exhibits to the PRDSUF include, *inter alia*: the Joyce Moore Rebuttal Declaration (*id.*, Ex. 1); the expert reports of Simson and Benjaminson (*id.*, Exs. 10 and 14 (at *id.*, attachment Nos. 10 and 15)),[4] which had been timely disclosed to defendants in discovery; and the Chasser Declaration (*id.*, Ex 36 (at *id.,* attachment Nos. 37 (Declaration) and 38-49 (exhibits to Declaration))), which purports to rebut certain facts relied upon and issues presented by the defendants in their Motion for Summary Judgment.  In support of their Reply ("Defs. SJ Reply"), the defendants filed the Declaration of Samuel L. Jackson (Docket No. 353) and an additional Declaration of Robb S. Harvey (Docket No. 357) ("Harvey Reply Declaration").

The defendants have filed separate Motions to Exclude the reports and testimony of plaintiffs' experts Simson and Benjamin,[5] a Motion to Strike the Chasser Declaration, and a Motion to Strike the Joyce Moore Rebuttal Declaration.  Because the plaintiffs rely on all of these materials in support of their opposition to the Motion for Summary Judgment, the court must resolve the pending Motions to Exclude and Motions to Strike before considering the

---

[3]The docket does not contain a redacted/unsealed version of Plfs' SJ Mem. or the PRDSUF.  Also, the plaintiffs did not file a separate Plaintiffs' Statement of Additional Undisputed Facts.  Instead, as described further herein, they elected to shoehorn additional "undisputed" facts into their responses to the defendants' cited facts.

[4]Because of the manner in which the plaintiffs electronically loaded the exhibits supporting the PRDSUF, many of the attachment numbers on the docket do not correspond to the actual exhibit numbers.  Because the parties reference the actual exhibit numbers (rather than the corresponding docket entry attachment numbers), the court will similarly utilize the actual exhibit numbers for ease of reference.

[5]As described further herein, the plaintiffs served expert reports from Simson and Benjaminson on October 7, 2011, pursuant to the Case Management Order and Fed. R. Civ. P. 26.  The court then stayed expert discovery pending submission of the instant Motions to Exclude.  Accordingly, Simson and Benjaminson have not been deposed.

Motion for Summary Judgment.

## ANALYSIS OF EXCLUSIONARY MOTIONS

I. **Motions to Exclude Experts**

A. **Legal Standard**

Federal Rule of Evidence 702 provides as follows:

> A witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods, and (d) the expert has applied the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), the Supreme Court identified four non-exclusive factors that may be helpful to the court in assessing the relevance and reliability of expert testimony, including (1) whether a theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential error rate and the existence and maintenance of standards controlling the theory or technique's operation; and (4) the extent to which a known technique or theory has gained general acceptance within a relevant scientific community. *Id.* at 593-94.

In its "gate-keeping" role, a trial court must evaluate the relevance and reliability of all expert testimony, whether the testimony offered is "scientific" or not. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). That said, the *Daubert* factors do not constitute a "definitive checklist or test." *Id.* at 150. Indeed, the court's fundamental objective is to generally evaluate, based on whatever factors are important to the

particular case, the relevancy and reliability of the testimony and not necessarily to explore

factors that might not be relevant to a particular case, such as whether the expert's methods are

subject to empirical testing. *Id.* at 151. That is, the court is to ensure that the proffered

testimony is reliable and relevant and that the expert, whatever his field, "employs in the

courtroom the same level of intellectual rigor that characterizes the practice of an expert in the

relevant field." *Id.* at 152.

The proponent has the burden of establishing that the pertinent admissibility

requirements have been meet by a preponderance of the evidence. Fed. R. Evid. 104; *see also*

*Pride v. Bic Corp.*, 218 F.3d 566, 577-78 (6th Cir. 2000) ("In short, under *Daubert* and its

progeny, a party proffering expert testimony must show by a 'preponderance of proof' that the

expert whose testimony is being offered is qualified and will testify to scientific knowledge that

will assist the trier of fact in understanding and disposing of issues relevant to the case.") (citing

*Daubert*, 509 U.S. at 592 n.10).

> **B.      Motion to Exclude Report and Testimony of John Simson**

>> 1.      Simson Expert Report and Qualifications

In the Simson Expert Report (Docket No. 299, Ex. 1; also attached at PRDSUF, Ex. 10),

Simson states that he was "to determine in my opinion whether the film SOUL MEN exploited

the career, legacy and reputation of Sam Moore and his famous duo, Sam and Dave, to garner

public appeal and attention." (*Id.* at p. 4.)

Simson has four decades of experience in the music industry, including work as a

recording artist, as an attorney with experience in intellectual property-related issues, as a

recording studio executive, as a consultant to prominent musicians, as a professor, and most

recently as the Executive Director of "SoundExchange," which is a performing rights organization responsible for collecting and distributing royalties from internet and satellite radio performances. Simson has never testified as an expert in a state court or federal court proceeding. However, in 2006, Simson testified before the federal Copyright Royalty Board in a ratemaking proceeding and, in 2008, before the Senate Judiciary Committee. In both instances, Simson testified in his personal capacity on issues unrelated to consumer confusion.

Simson prepared the opinions expressed in his report without reviewing any pleadings, discovery responses, documents produced in discovery, or deposition transcripts in this case. He has never seen the movie *Soul Men*, has not listened to the Soundtrack, and did not review Sam Moore's biography in preparing his opinions. Instead, Simson appears to base his opinions on just two sources of information. First, he claims to "remember seeing the trailer for the movie 'Soul Men' when it was offered on pay-per-view" and to "remember thinking before I saw the trailer that this must be a movie about Sam and Dave . . . ." (*Id.* at p. 4.) Second, "[t]o confirm the fact that SOUL MAN and HOLD ON I'M COMIN' are ingrained in the public's mind and overwhelming [sic] associated with Sam and Dave," he reviewed 2007-2011 data from the so-called "Media Guide," which apparently tracks the number of times artists receive "airplay" of their songs. (*Id.* at p. 5.)

Simson provides few details concerning the reliability of the Media Guide data, let alone its significance. He does not explain why he chose to rely only on Media Guide data or why he limited his analysis to the 2007 to 2011 time frame. Furthermore, he does not explain the type of "airplay" that the Media Guide data purports to reflect, how it is compiled, or how it is typically utilized. Moreover, Simson does not state that he has ever performed any type of consumer

preference analysis, let alone an analysis premised solely on Media Guide data. Indeed, he does not state that any expert has ever employed his stated methodology.

At any rate, Simson presents two charts reflecting his compilation of the Media Guide data relative to the "Soul Man" song and the "Hold On I'm Comin'" song. With respect to the song "Soul Man," he presents a chart (*id.*, Ex. 1 at p. 1) showing that the Sam & Dave version received "airplay" 69,828 times between 2007 and 2011, while the Blues Brothers version received "airplay" 32,940 times. Curiously, Simson does not state whether the Media Guide data reflects "airplay" of "Soul Men" by artists other than Sam & Dave and the Blues Brothers. Indeed, his report states that, between 2007 and 2011, "Soul Man" was performed "*most frequently* by Sam and Dave and the Blues Brothers," (*id.* at 5) (emphasis added), suggesting that other artists must also have performed the song during that time frame. The report does not provide data regarding the song "Soul Man" outside the 2007-2011 time frame. Furthermore, without explanation and without reference to any data or other authority, Simson states that, "[u]nlike the great Afro-American duo, Sam and Dave, no one could confuse the White Blues Brothers with Samuel L. Jackson and Bernie Mac, the Afro-American stars of SOUL MEN." (*Id.* at 5.)

As to the song "Hold On I'm Comin'," Simson's second chart (*id.,* Ex. 1 at pp. 2-3) indicates that the Sam & Dave version received airplay 53,431 times, compared to just 1,052 times by several other artists combined. Again, the completeness of this data set is unclear.

Based on this data, Simson purports to offer several opinions:

- "[T]he movie's appeal based on the title of the film, the performer's clothing, style and sound evident in the trailer, directly exploited Sam and Dave's public persona." (*Id.* at 4-5);

- "It is clear to me as a music professional for four decades that the public overwhelmingly associates these songs with Sam & Dave and that the producers of SOUL MEN had to know that when they produced this film." (*Id*. at p. 6);

- "[F]or any music fan of the Stax Volt era, (60's Soul or R & B) it was clear that 'Soul Men' [the Movie] was an attempt to capitalize on Sam & Dave, their unique place in American musical history and the legacy they created in Memphis, at Stax and in world contemporary popular culture as they were famous around the world. Their name and fame is tied to the song they were awarded a Grammy for in 1967, 'Soul Man'[,] as if they had been branded , marked and forever identified with [sic] and[,] because they were a duo[,] the plural "Soul Men" was also clearly been [sic] part and parcel in that branding."[6]  (*Id*.)

- "Sam Moore has carried that history and brand of the duo with him forward for at least 30 years to my knowledge and has been a champion if not the poster child for artist rights and their recovery."  (*Id.*)

(*Id.* at p. 6.)

2.    Challenges to the Simson Report

The defendants argue that the Simson Report should be excluded for multiple reasons: (1) the report does not satisfy Fed. R. Civ. P. 26(a)(2)(B), which requires an expert to provide a complete statement of all opinions expressed and the bases for those opinions; and/or (2) the testimony does not meet the *Daubert* standard because (a) Simson is not qualified to testify on the subject matter of his report; (b) his testimony will not assist the trier of fact to the extent it relates to material within the experience of a layperson or states an ultimate legal conclusion; and/or (c) the opinions are not supported by reliable principles and methodology.

(a)    Procedural Challenge

As to the first argument, the court will not find that the report should be excluded for

---

[6]As this passage indicates, the Simson Report contains numerous grammatical errors and omissions, which the court has endeavored to correct for the sake of clarity, where necessary.

failure to comply with Fed. R. Civ. P. 26(a)(2)(B).  That rule is designed to avoid unfair surprise to the opposing party at trial and to relieve opposing counsel of the need to depose the expert witness separately before trial.  *See* 6 Moore's Federal Practice - Civil § 26.23[2][B][ii] (3d ed. 2012); *United States v. Roberts*, – F. Supp. 2d – , Case No. 3:09-0812, 2011 WL 5826614, at *10-11 (M.D. Tenn. Nov. 17, 2011).  The defendants point out that the Sixth Circuit, in *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 271 (2010), interpreted Rule 26(a)(2)(B) to require a "line of reasoning arising from a logical foundation" and found that it was appropriate to strike an expert report in a copyright infringement case for failure to meet that standard.  However, *Olmstead* concerned an expert who had submitted a two-page report that summarily stated an opinion and attached 200 pages of exhibits, apparently without any explanation of their relationship to his conclusory opinion – *i.e.*, the report appears to have constituted largely *ipse dixit* opinions and an associated "exhibit dump."  *Id*.  Here, there is no dispute that Simson has expressed all of his opinions and the purported bases for those opinions – however deficient – in his report.  Indeed, the defendants have moved to exclude Simson's opinions without having deposed him, demonstrating that the report is procedurally sufficient to enable the defendants to address Simson's opinions on their merits.

(b)     Substantive/Evidentiary Challenges

Although the report arguably meets the requisite procedural criteria of Rule 26, Simson's opinions will be excluded for several independent substantive reasons.

First, Simson is not qualified to render the opinions he offers.  The plaintiffs argue that Simson has an "esteemed music industry reputation," (Docket No. 327 at p. 7), from which the court should apparently presume his expertise in the subject matter of his report.  Although

Simson certainly has participated in the music and recording industry in a number of respects over the past 40 years, there is no indication that he has any experience (educational, professional, otherwise) relating to the issues of consumer perception, consumer confusion, and subjective intent. Furthermore, Simson has never appeared as an expert in state or federal court on any topic, let alone the subject matter of his report, and his appearances before the Copyright Royalty Board and the Senate Judiciary Committee were made in a lay capacity on issues outside the scope of the opinions he seeks to present here. Moreover, Simson has never performed an analysis of consumer perception/confusion, and the plaintiffs have not shown that he has published any peer-reviewed articles on this topic or any other. Although it may be that Simson is qualified to testify about something, he is not qualified to offer the opinions expressed in his report, which concern consumer perceptions, consumer confusion, and subjective intent. *See Rose v. Truck Ctrs., Inc.*, 388 Fed. App'x 528, 533 (6th Cir. 2010).

Second, even assuming *arguendo* that Simson is appropriately qualified, his methodology is woefully deficient and his opinions are entirely speculative and conclusory. As an initial matter, it is simply incredible that Simson would seek to offer his opinions without reviewing *any* materials related to this case. *See Downs v. Perstorp Components, Inc.*, 126 F. Supp. 2d 1090, 1125-26 (E.D. Tenn. 1999) (expert's purported reliance on insufficient information raises a "red flag" that opinions may not meet *Daubert* standard). Regardless, he does not explain the significance of Media Guide data, how it is compiled, what it reflects, and/or whether it is typically (or ever) utilized as a proxy for consumer perception. He does not explain why he limited his analysis to the 2007-2011 time frame. Moreover, it appears that he relies on an incomplete data set even for that time frame. Furthermore, it is unclear what information that

data conveys relative to public perceptions and the defendants' alleged knowledge of those perceptions in producing and marketing *Soul Men*. For example, even if the Sam & Dave version of Soul Man were aired twice as much as the Blues Brothers version during the 2007 to 2011 time frame, that fact alone would not establish that the Sam & Dave version of "Soul Man" is "ingrained in the public's mind," as Simson claims. Indeed, neither Simson nor the plaintiffs have identified a single instance in which anyone – inside or outside of the litigation context – has employed a similar "methodology" to that utilized in Simson's report.

Third, many "opinions" expressed in Simson's report simply have no foundation. His opinions relating to what the defendants "must have known" when they produced and marketed *Soul Men* and its soundtrack are entirely speculative. Furthermore, without any analysis or reference to any data or legal authority, he claims that the "fame" of "Sam & Dave" "is tied to the song . . . Soul Man [,] as if [Sam & Dave] had been branded, marked and forever identified" with that song "and[,] because they were a duo[,] the plural 'Soul Men' was also clearly been [sic] part and parcel in that branding." However, Simson's analysis of the Media Guide data bears no apparent relationship to these conclusions and Simson's report contains no data or analysis relating to the issue of "branding," particularly as relates to the distinction between the terms "Soul Man" and "Soul Men." Finally, it is unreasonable for Simson to base his opinions on his personal recollection and subjective impressions of the Movie trailer he saw several years ago. *See Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 325 F. Supp. 2d 841, 847 (M.D. Tenn. 2004) ("Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data

and the opinion proffered.") (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997)).

In sum, Simson is unqualified to offer the opinions expressed in his report, and those opinions are based on a demonstrably flawed methodology, are conclusory, and/or are otherwise unsupported. Therefore, the court will grant the defendants' Motion to Exclude the Simson Report and Testimony.

### C. Motion to Exclude Expert Report and Testimony of Peter Benjaminson

1. <u>Benjaminson Report and Qualifications</u>

The plaintiffs asked Benjaminson to render an opinion as to whether the "Soul Men" movie "could have been based on the 1960s soul duo, 'Sam & Dave,' or on 'The Pips.'" (Docket No. 301, Ex. 1, Benjaminson Report, at p. 1; also attached PRDSUF, Ex. 14)

According to his resume, Benjaminson received an M.S. in Journalism from Columbia University in 1968 and served a fellowship in economics journalism at Princeton University from 1976 to 1977. He served as an Assistant Professor of English at Binghamton University from 1981-1986, as an Associate Professor of Journalism and Mass Communication at New York University from 1986-1990, and as an Assistant Professor of Journalism at Columbia University's Graduate School of Journalism from 1990-1991. Since 1991, Benjaminson apparently has worked solely as an author, publishing several books and other publications, including three books relating to "Motown" music and/or soul music of the 1960's. He has never testified as an expert in any judicial proceeding.

Although the report does not contain a section specifically stating the nature of Benjaminson's ultimate opinion(s), Benjaminson's chief opinion appears to be that he

"believe[s] that the movie 'Soul Men' referred to Sam & Dave only and not the Pips."  (*Id.* at p. 2.)

In preparing his report, Benjaminson reviewed only the following materials: (1) video promotional materials associated with the film; (2) a marketing plan for the Movie's soundtrack, and (3) a photo of Sam & Dave performing with Carla Thomas, who apparently was a soul music artist.  Benjaminson also states that he saw the movie *Soul Men* when it first appeared in theaters and that he has "also seen broadcast performances by Sam & Dave and Gladys Knight & the Pips."  (*Id.* at p. 1.)  He does not state that he has listened to the Soundtrack or reviewed any other documents or media related to this case.  Aside from seeing the Movie in theaters when it was released in 2008, it does not appear that he reviewed the Movie specifically to prepare his opinions here.

To form his opinion, Benjaminson identifies 12 reasons that the Movie "referred to Sam & Dave only and not to the Pips."  (*Id.* at p. 2.)  These include, *inter alia*, the following facts: the Pips included three women and two men, whereas Sam & Dave, like the lead characters in *Soul Men*, performed as a duo; at one point, the Pips included four females, whereas Sam & Dave and the lead characters in *Soul Men* are/were men; the Pips were all related, while Sam & Dave and the lead characters in *Soul Men* are not related; the lead characters in *Soul Men* performed "Hold On' I'm Comin'" in the Movie, but did not perform any songs by the Pips; unlike Sam & Dave, the Pips never recorded for Stax Records, which was featured prominently in *Soul Men*; the Pips only performed choreographed danced moves, whereas Sam & Dave and the lead characters in *Soul Men* danced with "great creativity and enthusiasm"; and Isaac Hayes, who appears in *Soul Men* as an associate of the two lead characters, produced music with Sam & Dave, but not the

Pips.

Based on these observations, Benjaminson concludes that "*everything in this movie* refers to Sam & Dave and Stax records."  (*Id.* at p. 5) (emphasis added.)  He also concludes that "[n]either the film nor the marketing materials contain references [–] visual, musical, verbal, or otherwise [–] to the Pips, to Gladys Knight & the Pips, or to Motown Records."  (*Id.*)

Benjaminson does not state why he chose to rely on the limited materials presented to him.  He does not state that he has ever performed a comparative analysis of recording artists or that he is relying on any type of scientific, technical, or specialized methodology.

2.     Challenges to the Benjaminson Report

The defendants challenge Benjaminson's Report on the following grounds: (1) the report does not satisfy Fed. R. Civ. P. 26(a)(2)(B); (2) Benjaminson's proposed opinions do not meet the *Daubert* standard because (a) Benjaminson is not qualified to testify on the subject matter of his report; (b) his testimony will not assist the trier of fact to the extent it relates to material within the experience of a layperson or states an ultimate legal conclusion; and/or (c) the opinions are not supported by a reliable methodology.

(a)     Procedural Challenge

As with the Simson Report, the court will not hold that the Benjaminson Report – although substantively deficient – did not meet the basic requirements of Rule 26(a)(2)(B). Again, unlike *Olmstead*, the Benjaminson Report does not involve an "exhibit dump" and at least purports to articulate a basis for Benjaminson's opinions.  Furthermore, the defendants have challenged the admissibility of Benjaminson's opinions on their merits, without the need for a deposition.  Under these circumstances, the court will consider the substantive evidentiary

16

validity of Benjaminson's opinions.

(b)     Substantive/Evidentiary Challenges

The Benjaminson Report will be excluded for several independent substantive reasons.

First, the subject of Benjaminson's report is largely irrelevant and purports to address an argument that the defendants have not made.  The defendants argue that *Soul Men* is entirely fictitious and not based on the lives of Sam & Dave.  Nowhere in the record have they argued that the lead characters in the Movie are based on The Pips.  Instead, the plaintiffs appear to have seized on a deposition comment from one of the Movie's third-party scriptwriters, Matthew Stone.  At deposition, Stone discussed the early concept stages of the *Soul Man* movie, when Stone and others were considering making a Movie that involved Samuel L. Jackson and Bernie Mac in some capacity.  Originally, agents for Samuel L. Jackson and Bernie Mac had discussed with Stone and others that the actors would play owners of competing barbecue stands.  The idea was rejected, at which point "[o]ne of us said something to the effect of [']what if these guys were like old back-up singers like the Pips and their lead singer had died, and they had to get back together.  They hated each other and they had to get back together.[']  The people in the room said that sounds funny."  (DSUF, Ex. 23, Stone Dep. Transcript, at 16:10-17:25.)  As Stone's deposition testimony makes clear, Stone did not base the script on any actual knowledge of the history or makeup of the Pips, of which he had limited knowledge, if any; in the Movie's concept process, he simply thought of the Pips broadly as backup singers to a more well-known lead singer.  (*See id.* at 34:4-9 ("Q: Do you know the life story of the Pips?  A.  I do not know the life story of the Pips.  They were used merely as an example of those kind of singers who were there only to support a headline singer.")

17

Furthermore, the defendants do not contend in their summary judgment briefing that the Movie was actually based on the Pips, nor have the plaintiffs identified any other testimony or discovery response even referencing such an intention. Thus, there is no disputed issue to resolve in the first place, because the defendants do not contend (nor did the scriptwriters or anyone else testify) that the Movie was based on the life story of the Pips.

Second, even if there were some evidentiary relevance to the report, Benjaminson's testimony will not assist the trier of fact. Under Fed. R. Evid. 702, expert testimony is inadmissible when it addresses matters equally within the competence of the jury to decide. *See McGowan v. Cooper Indus., Inc.*, 863 F.2d 1266, 1272 (6th Cir. 1988); *Birdwell v. Corso.*, No. 3:07-cv-0629, 2010 WL 4312869, at *4 (M.D. Tenn. Oct. 25, 2010). Here, the Benjaminson report essentially contains only observations about the similarities between certain aspects of the movie *Soul Men* and Sam & Dave. As the defendants point out, Benjaminson's report simply echoes observations that the plaintiffs have already made in their Complaint, First Amended Complaint, discovery responses, and deposition testimony, as well as in Pltfs. SJ Resp. It is plainly within the ken of the jury to watch *Soul Men*, to listen to testimony from the plaintiffs and other witnesses regarding the history of Sam & Dave, to hear testimony and review documents regarding the creative process behind *Soul Men*, and to compare the Movie's characters, plot, and script with that testimonial background. This process does not require and will not be assisted by testimony from Benjaminson.

Third, the Benjaminson report is not based on any scientific, technical, or specialized methodology, let alone a reliable one. Benjaminson simply states his credentials, makes twelve largely generic lay observations comparing the lead characters and plot of *Soul Men* to the

respective histories of and composition of Sam & Dave and The Pips, and then summarily concludes that "everything" in the Movie "refers to Sam & Dave" and Stax Records. There is no indication in the record that Benjaminson or any other expert has ever utilized a similar "methodology." Furthermore, the fact that Benjaminson did not re-watch the *Soul Men* film to prepare his report seriously undermines the reliability of his opinion that "everything in the movie" concerns Sam & Dave.[7]

As a final note, the plaintiffs in their Response suggest that Benjaminson would render additional opinions at trial that are not directly expressed in his report, including "the historical origins and significance of the song 'Soul Man,'" "expert testimony, as an historian of the soul music era [,] on [the] performances of [Jackson and Mac in *Soul Men*] and the relevance to Sam & Dave and Plaintiff Sam Moore"; and "the importance of Isaac Hayes and the Tennessee venues to the Movie." (Docket No. 326 at pp. 7-8.) The report does not articulate these opinions, let alone provide support for them. Therefore, regardless of the admissibility of the opinions actually expressed in his report, the court would not permit the introduction of these previously undisclosed opinions at trial.

## II.    Motion to Strike Chasser Declaration

### A.    The Chasser Declaration

In support of their Motion for Summary Judgment, the defendants filed the Declaration of Robb Harvey. As stated in the Harvey Declaration, the defendants utilized internet searches

---

[7]Although the court is excluding Benjaminson's expert report and testimony, the court will, in any case, ultimately consider many of the parallels that Benjaminson identifies between Sam & Dave and *Soul Men*, which are largely redundant of points otherwise made by the plaintiffs in their pleadings and briefing papers.

to compile documentation reflecting third-party uses of the phrases "soul man," "soul men," or "soul." The defendants produced these records to plaintiffs in discovery. Exhibit A to the Harvey Declaration contains a summary chart that lists "many" of the third-party uses and references, as reflected in the information compiled by the defendants from the internet or that otherwise appear in the evidentiary record. Exhibit B to the Harvey Declaration contains documentation reflecting these uses.

In their summary judgment briefing, the defendants rely on the Harvey Declaration with respect to the issue of "genericness" of the purported Marks that the plaintiffs claim were infringed and/or diluted. (*See, e.g.*, Defs' SJ Mem. at p. 22 (referencing DSUF ¶¶ 55-61); DSUF ¶¶ 55-61 (referencing Harvey Declaration)). For example, the chart indicates that several current or former performing artists utilize or incorporated "Soul Man" or "Soul Men" into their stage names, including "The Soul-Men," "The Soulmen," and John "Soul Man" Castro, among others. Similarly, the chart indicates that several films have incorporated or will incorporate these terms, including the 1986 movie *Soul Man* (for which Sam Moore recorded a new version of the song "Soul Man"), the 2007 independent film *Soul Men*, and a forthcoming animated film "*Soul Man*" scheduled for release in 2014.

The plaintiffs have not challenged the accuracy of the defendants' submissions – for example, they do not dispute that there is a current musical group called "The Soulmen" – but they challenge the relevance of this information on the issue of genericness. In an effort to rebut the defendants' proof on this issue, the plaintiffs filed a declaration from Anne Chasser, the Former Commissioner for Trademarks at the United States Patent and Trademark Office ("USPTO"), in support of their Response to the Motion for Summary Judgment.

Chasser's Declaration purports "to provide expert testimony in rebuttal to the asserted statements of fact by the Defendants in this proceeding." (*Id.* ¶ 8.) Chasser analyzes the Harvey Declaration and the chart of alleged "third-party uses" attached thereto, grouping them into three categories: (1) uses of the phrases and titles in single works (*e.g.*, CDs, movies), (2) media and general uses, and (3) uses as names of performing artists. As to the first category, she opines that titles of single expressive works are always deemed descriptive, meaning that, if any of those materials were submitted as specimens of "use" to the USPTO, a trademark examiner would reject the specimen and require other proof of use. As to the second category, she contends that they involve "mainly editorial commentary regarding individuals, used in a non-trademark way," (*Id.* ¶ 12), and thus are descriptive, non-trademark uses that would not support a registration as a trademark. As to the third category, she states that, while it is possible that the uses could be accepted as specimens of trademark use, the Harvey Declaration provides insufficient detail to make that determination.

Chasser also offers an opinion concerning the September 17, 1999 trademark applications by Sam Moore, which were allowed by the USPTO but not registered because Sam Moore did not file a Statement of Use. Chasser opines that, because the USPTO signed the applications, "[t]his means that the Examining Division believed the mark was capable of being registered and not generic." (*Id.* ¶ 15.) She also opines that, if one of the other artists or groups referenced in the Harvey Declaration sought to register its title and the application was published for registration, "the Plaintiffs would be in a position to file an opposition that could challenge such application based on their common law, priority of use." (*Id.* ¶ 16.)

**B.      Challenges to the Chasser Declaration**

The defendants argue that the Chasser Declaration should be stricken for two reasons. First, the defendants argue that the Chasser Declaration is not a "rebuttal" report, but instead constitutes an untimely expert report that should have been disclosed on October 7, 2011, the date on which plaintiffs were obligated to serve case-in-chief expert reports. Second, the defendants argue that the Chasser Declaration improperly offers opinions on ultimate legal issues. In response, the plaintiffs argue that the declaration constitutes a timely "rebuttal" report and that Chasser does not offer any legal conclusions regarding the validity of plaintiffs' trademarks. In the alternative, the plaintiffs argue that the failure to disclose Chasser's opinions on October 7, 2011 was "substantially justified" and accordingly request leave to file the Chasser Declaration as an expert report for "good cause" shown, pursuant to Fed. R. Civ. P. 16(b)(4).

1. Rebuttal Challenge

The plaintiffs were required to serve case-in-chief expert reports on October 7, 2011. The plaintiffs did not file any expert report on the issue of genericness by that date. Subsequent to that deadline, the court stayed all further expert discovery, including the disclosure of "rebuttal" experts, pending the filing of and disposition of the Motions to Exclude the Simson Report and Testimony and the Benjaminson Report and Testimony. The plaintiffs argue that the Chasser Declaration constitutes a "rebuttal" report and, because there is no deadline for the submission of rebuttal reports, is therefore timely.

Under Fed. R. Civ. P. 26(a)(2)(D)(ii), expert rebuttal evidence is limited to "evidence . . . intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C) . . . ." Thus, a "rebuttal" report must rebut theories set forth in an expert report and/or forthcoming opinion testimony to be presented by an opposing party.

*See Campos v. MTD Prods., Inc.*, No. 2:07-CV-00029, 2009 WL 2252257, at *9 (M.D. Tenn. July 24, 2009). Here, the plaintiffs do not identify any expert report or opinion testimony to which the Chasser Declaration is responsive. Thus, under a straightforward application of the federal rules, the Chasser Declaration does not constitute a rebuttal report pursuant to Rule 26(a)(2)(D)(ii).

Also, the Chasser Declaration relates to a case-in-chief issue. "If a trademark is not federally registered, once the defendant raises genericness as a defense, plaintiff must prove lack of genericness." *Bath & Body Works, Inc. v. Luzier Personalized Cosmetics, Inc.*, 76 F.3d 743, 748 (6th Cir. 1996) (citing J.T. McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 12.02[7][b] (3d ed. 1992)); *see also Borescopes R US v. 1800Endoscope.com, LLC*, 728 F. Supp. 2d 938, 947 (M.D. Tenn. 2010). The defendants asserted a genericness defense in their Answers to the Complaint and the First Amended Complaint, well before the expert deadline. (*See, e.g.*, Docket No. 120, TWC Answer to Complaint, filed June 9, 2010, at pp. 12-13, Additional Affirmative Defense Nos. 13 and 14; Docket No. 251, TWC Answer to First Amended Complaint, filed August 26, 2011, at p. 12, Additional Affirmative Defense Nos. 13 and 14). Therefore, plaintiffs had the burden of proving, in their case in chief, that the alleged Marks are not generic. The deadline for plaintiffs to submit expert reports on case-in-chief issues was October 7, 2011.

(2)   <u>Request for Relief</u>

Although the Chasser Declaration is not a rebuttal expert report, the plaintiffs have shown good cause to justify submission of certain aspects of the Chasser Declaration at this stage. Under Fed. R. Civ. P. 37(c)(1), "if a party fails to . . . identify a witness as required by

23

Rule 26(a) or (e), the party is not allowed to use that . . . witness to supply evidence on a motion, at a hearing, or at a trial unless the failure was substantially justified or is harmless." Thus, "the sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless." *Roberts ex rel. Johnson v. Galen of Va., Inc.*, 325 F.3d 776, 782 (6th Cir. 2003) (quoting *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir 1995)). The burden is on the potentially sanctioned party to show that its omissions were substantially justified or harmless. *Id.* (citing *Salgado*, 150 F.3d at 741-42). Within the Sixth Circuit, "harmlessness, not prejudice, 'is the key under Rule 37.'" *Smith v. Pfizer, Inc.*, 265 F.R.D. 278, 283 (M.D. Tenn. 2010) (quoting *Sommer v. Davis*, 317 F.3d 686, 692 (6th Cir. 2003)).

As the plaintiffs point out, although the defendants previously identified and/or produced the records attached at Exhibit B to the Harvey Affidavit, the plaintiffs reasonably could not have anticipated the precise manner in which the defendants intended to utilize those documents, or, for that matter, whether the defendants would rely on them at all. Moreover, the chart attached as Exhibit A to the Harvey Declaration appears to have been created by counsel for the defendants and introduced for the first time at summary judgment. The Harvey Declaration purports to divide various third-party uses into categories and sub-categories. Thus, it purports to characterize and summarize the data in a form not previously disclosed to the plaintiffs. To the extent that the Chasser Declaration is directed specifically to rebutting the significance that defendants place on the Harvey Declaration Exhibit A chart, it is justifiable that the plaintiffs have introduced expert testimony concerning that chart at this stage.

The defendants have not identified any harm or prejudice that would result from

consideration of these aspects of the Chasser Declaration at this stage.[8]  Indeed, the defendants

have already asserted a merits-based challenge to Chasser's Declaration – *i.e.*, that her testimony

improperly states a legal conclusion – affording them essentially the same opportunity to

challenge her opinions as the opportunity to challenge the opinions of Simson and Benjaminson.

Furthermore, because of the expert discovery stay, the defendants would still have an

opportunity to respond to Chasser's opinions in this regard.  Thus, it is appropriate for the court

to consider these aspects of the Chasser Declaration, even though they ultimately relate to

plaintiffs' case-in-chief.

However, certain opinions expressed in the Chasser Declaration are unjustifiably

untimely.  Chasser analyzes the legal significance of Sam Moore's trademark applications,

apparently based on her consideration of just one of the 1999 trademark applications and certain

records produced by the plaintiffs, including, *inter alia*, performance flyers, news articles, and

communications to a third party from Sam Moore's counsel regarding potential infringement.

(*See* Chasser Decl. ¶¶ 14-15 and Exs. 3-4 thereto.)  Regardless of the methodological validity of

Chasser's analysis, the plaintiffs had the burden of proving that they possess common law

trademarks, that their alleged Marks are not generic, and that their Marks are sufficiently strong

to justify substantial protection, such as with respect to their federal trademark dilution claim.

The materials on which Chasser relies to form her opinions regarding the effect of Sam Moore's

1999 applications on the validity and strength of the Marks were in plaintiffs' possession well

before the expert deadline.  Thus, nothing prevented the plaintiffs from introducing Chasser's

---

[8]The defendants simply complain about "being forced to go through this unnecessary
exercise."  (Docket No. 372 at p. 8.)

opinions by the case-in-chief expert deadline of October 7, 2011.  In other words, the

defendants' submission of the Harvey Declaration did not "open the door" to Chasser's opinions

on certain issues.  Therefore, the court will strike these opinions.

Similarly, Chasser's assessment of the strength of the plaintiffs' alleged Marks relative to

the other references to "soul man" or "soul men," which is necessarily premised on her excluded

opinions regarding the strength of the plaintiffs' Marks, will be stricken.

Accordingly, the court will consider paragraphs 1-13 and 18 of the Chasser Declaration,

but will strike paragraphs 14-17.[9]  Ultimately, the defendants appear to agree with the opinions

Chasser expresses in the paragraphs that the court will consider.  (*See* Docket No. 372 at p. 5

("Plaintiffs . . . cite to Chasser's Declaration in their summary judgment opposition brief to

indicate that evidence of third party uses 'soul men' and 'soul man' were not trademark uses

(Defendants have never contended that they all were) . . . .")  At any rate, the court will consider

the persuasive weight of the non-stricken portions of the Chasser Declaration as part of its

analysis of the Motion for Summary Judgment.

## III.   Motion to Strike Joyce Moore Rebuttal Declaration

### A.   Joyce Moore Rebuttal Declaration

In support of the Motion for Summary Judgment, the plaintiffs filed and rely upon the

Moore Rebuttal Declaration, which contains 23 paragraphs of purported "facts."  The declaration

asserts facts that relate to a number of topics, including, *inter alia*, the relationship between the

---

[9]Paragraph 17 of the Chasser Declaration simply notes that none of the documents
referenced in the Harvey Declaration uses the words "Original" or "Legendary."  This statement
does not express an opinion and makes an observation that is obvious to a layperson.
Accordingly, the court will strike this paragraph, as well.

plaintiffs and Tennessee (presumably bearing on choice of law), the history of "Sam & Dave,"

Sam Moore's efforts to promote his alleged Marks, and anecdotes regarding Sam Moore's

career.

### B. Legal Standard and Challenges to the Moore Declaration

Under Fed. R. Civ. P. 56(c)(4) (2012),[10] "[a] supporting affidavit or opposing affidavit

must be made on personal knowledge, set out facts that would be admissible in evidence, and

show that the affiant is competent to testify on the matters stated." *See Totman v. Louisville*

*Jefferson Cnty. Metro Gov't*, 391 Fed. App'x 454, 464 (6th Cir. 2010). Inadmissible hearsay,

pure speculation and argument, information not based on personal knowledge, and irrelevant

information do not meet the Rule 56 standard. *See Alpert v. United States*, 481 F.3d 404, 409

(6th Cir. 2007) (hearsay); *Milne v. Mills*, No. 84-1493, 765 F.2d 145, 1985 WL 13294, at *1 (6th

Cir. May 29, 1985) (unpublished) (speculation, argument, lack of personal knowledge); *Walker*

*v. Bradley Cnty.*, No. 1:10-CV-124, 2011 WL 1877792, at *1 (E.D. Tenn. May 17, 2011)

(hearsay, speculation, relevance). A court may strike an affidavit or portions thereof to the

extent it fails to meet the standard of Rule 56(c)(4). *See Upshaw v. Ford Motor Co.*, 576 F.3d

576, 593 (6th Cir. 2009) (finding that district court abused its discretion by striking the entire

affidavit, rather than striking only the inadmissible portions thereof).

Furthermore, a party cannot create genuine issues of material fact by contradicting prior

deposition testimony. *See Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 906-907 (6th Cir.

2006); *Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir. 1997); *Reid v. Sears, Roebuck*

---

[10]Although both parties cite to Rule 56(e)(1), that rule was amended in 2010 and partly incorporated into Rule 56(c)(4). Pre-2011 cases cite to substantially similar language in the former Rule 56(e)(1).

*and Co.*, 790 F.2d 453, 460 (6th Cir. 1986). In *Aerel*, the Sixth Circuit clarified that, while a non-moving party is barred from simply filing an affidavit that "directly contradicts that party's previous testimony," Rule 56 does not "prevent[] a party who was not directly questioned about an issue from supplementing incomplete deposition testimony with a sworn affidavit." 448 F.3d at 907-909. Therefore, "a district court deciding the admissibility of a post-deposition affidavit at the summary judgment stage must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony[.] If, on the other hand, there is no direct contradiction, then the district court should strike or disregard the affidavit unless the affidavit constitutes an attempt to create a sham fact issue." *Id.* at 908 (internal citations and quotation marks omitted).

Here, the defendants argue that the declaration should be stricken in its entirety because it is not based on personal knowledge, includes inadmissible hearsay, conflicts with prior sworn deposition testimony, and includes conclusory allegations on issues of law.

### C.     Application

Various statements in the Joyce Moore Rebuttal Declaration are not based on personal knowledge, reflect speculation, and/or purport to offer legal conclusions. Although the plaintiffs point out that Joyce Moore first met Sam Moore in the late 1960's and was friends was Dave Prater's girlfriend, she did not begin serving as Sam Moore's manager until 1981. Thus, the plaintiffs have not established that Joyce Moore would have personal knowledge of Sam Moore's career before 1981. Also, many statements in the declaration impermissibly reflect Joyce Moore's speculation regarding the actions, thoughts, and/or motivations of third parties. The declaration also purports to express legal conclusions on a number of issues, such as Joyce

Moore's belief that the *Soul Men* movie "poached the name of the famous song [*i.e.*, "Soul Men"] that lifts and impinges itself [sic] on that history, legacy, and, [sic] fame and trademarks of Sam Moore as part of and owner of the trademark Sam & Dave." (*Id.* ¶ 20.) Finally, certain paragraphs contains irrelevant information. (*See, e.g.*, ¶¶ 9 ("Regarding *Dole Man*, I wrote the lyrics . . . .")[11]; 18 ("I . . . have a daughter (who is white and stunning) who could look like my sister as I was only just 20 when I gave birth to her.").)

Although certain paragraphs must be stricken, other paragraphs include statements that meet the Rule 56 standard. For example, Joyce Moore states that she has acted as the "MC" at Sam Moore's performances, at which she has introduced Sam Moore and his backup band as "The Soul Men and the Ladies." (*Id.* ¶ 7.) This statement and certain others in the declaration convey information within Joyce Moore's personal knowledge, are not speculative, and do not appear to contradict prior deposition testimony. The court interprets these statements as appropriate supplementation of Joyce Moore's prior testimony that is consistent with Rule 56(c)(4) and will, therefore, consider them.

The court disagrees with the defendants' argument that certain referenced paragraphs of the Joyce Moore Rebuttal Declaration directly contradict prior deposition testimony. The court has compared the declaration statements to the cited deposition transcript portions and has found no direct contradiction. Also, although the defendants argue that certain asserted facts "were not mentioned during [Joyce Moore's] deposition despite plenty of opportunities for her to do so," (Docket No. 356 at p. 5 n.4), the defendants do not identify any portion of her deposition that

---

[11]In connection with then-Senator Bob Dole's Presidential campaign, Sam Moore recorded the song "Dole Man," which was set to the music of "Soul Man," contained lyrics tailored to the campaign, and utilized the refrain "I'm a Dole man" in place of "I'm a Soul Man."

establishes this point. Accordingly, the court will not strike any portions of the affidavit on these grounds.

Based on these findings, the court holds as follows:

- Paragraphs 3, 4, 8, 9, 12, 13, 16-18, and 23 of the declaration are stricken in their entirety.

- The following portions of the remaining Paragraphs are stricken:

| | |
|---|---|
| Paragraph 6: | The first sentence. |
| Paragraph 14: | The clause beginning "therefore" through the end of the sentence. |
| Paragraph 19: | Within the third sentence, the clause beginning "because . . ." through the end of that sentence; and the last sentence (beginning "Many people . . ."); |
| Paragraph 20: | The fifth sentence (beginning "That documentary . . . "). |
| Paragraph 21: | All of this paragraph, except for the first sentence (beginning "Ian Benchley . . .") and the last sentence (beginning "Our project . . . "). |

- The court will consider Paragraphs 1, 2, 5, 7, 10, 11, and 15 in their entirety and will consider the non-stricken portions of Paragraphs 6, 14, and 19-21.

Although some of the non-stricken portions of the Joyce Moore Rebuttal Declaration contain statements of limited relevance, the court will analyze the significant of these facts in connection with the Motion for Summary Judgment.

In sum, in addressing the Motion for Summary Judgment, the court will not rely on the Simson Report, the Benjaminson Report, the stricken portions of the Chasser Declaration, or the stricken portions of the Moore Rebuttal Declaration.

## I.     The Parties' Presentation of "Undisputed" Facts

Under Local Rule 56.01(b), the moving party on a Rule 56 motion is required to provide a concise statement of material facts as to which the moving party believes there is no genuine dispute for trial.  Under Local Rule 56.01(c), a party opposing the motion must respond to each fact set forth by the movant by (i) agreeing that the fact is undisputed; (ii) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment; or (iii) demonstrating that the fact is disputed, by specific citation to the record.  Under Rule 56.01(c), the non-moving party's response may also include a concise statement of additional facts that the non-movant contends are material and as to which the non-movant contends there exists a genuine issue to be tried.

In compliance with Local Rule 56.01(b), the defendants filed their Statement of Undisputed Facts with their Motion for Summary Judgment.  However, the plaintiffs did not fully comply with their obligations under Local Rule 56.01.  In particular, rather than filing a separate, itemized statement of additional facts, the plaintiffs have attempted to shoehorn additional facts (often largely irrelevant ones) into their responses to the defendants' facts, even where the responses do not actually create a genuine issue concerning the cited fact.[12]  To add to

---

[12]*See, e.g.*, PRDSUF at p. 12, ¶ 43:

Defendants' Fact:

> "Mr. Moore re-recorded the song *Soul Man* with Lou Reed for the 1986 movie *Soul Man* (which is [about] a white student who tries to make his skin darker to obtain a black scholarship to go to Harvard).  *See* Am. Compl. ¶ 58."

Plaintiffs' Response:

the court's burden, the plaintiffs filed a Notice of Errata (Docket No. 352) that (1) purports to correct, add citations to, or otherwise clarify statements within 36 of the Responses contained in the PRDSUF; (2) adds pages inadvertently omitted from two exhibits to the PRDSUF; and (3) introduces an additional exhibit containing several emails.

Because of the manner in which the plaintiffs responded to the DSUF, the court has had to (a) cross-reference each fact with the the errata sheet to determine whether the citations in the PRDSUF are accurate and/or complete; and (b) conduct an itemized fact-by-fact analysis of the PRDSUF simply to determine which responsive facts actually purport to create a potential dispute, as opposed to additional facts that should have been introduced through a separate Rule 56.01 statement.[13]

Furthermore, the plaintiffs' failure to file a separate Local Rule 56.01 statement has left the court with no specific itemized reply by the defendants to those additional facts pursuant to Local Rule 56.01(d). However, to the extent this may have prejudiced the defendants, the defendants have waived any objections by broadly addressing the plaintiffs' additional facts in the defendants' summary judgment Reply brief (Docket No. 358 at pp. 2-4) and by declining to seek any relief from the court.

_____

"Undisputed as to the recording of Soul Man with Lou Reed; disputed to the extent the Defendants have repeatedly attempted to characterize the film (which was co-produced by Steve Tisch, New York Giants' owner and friend of Harvey Weinstein) in pejorative terms. The film featured performances by legendary actors, James Earl Jones and Leslie Nielsen, and was co-produced by Steven Tisch (co-owner of the New York Giants and friend and colleague of Harvey Weinstein) [repetition in original]. *See* Exhibit 8; Exhibit 1 at ¶ 10."

[13]The plaintiffs' Notice of Errata also makes similar additions and amendments to various pages of Plaintiffs' SJ Response brief. Thus, the court similarly has had to cross-reference the Notice of Errata with the plaintiffs' brief.

Accordingly, the facts referenced in this Memorandum reflect the court's fact-by-fact analysis of the DSUF and the PRDSUF in light of the evidentiary exclusions noted herein, the plaintiffs' Notice of Errata, the Plaintiffs' SJ Response to the extent it addresses the DSUF, the defendants' SJ Reply brief to the extent it addresses the PRDSUF, and any other factual materials separately presented for the court's consideration, including the Samuel L. Jackson Declaration the Harvey Declaration, and the Harvey Reply Declaration.

II.    Facts

    A.    General Background Regarding Sam Moore/Sam & Dave

Sam Moore is a renowned African-American entertainer who has performed both domestically and internationally for several decades.  In 1965, Atlantic Records signed Sam & Dave, after which it permitted Sam & Dave to record music through the Stax Records company in Memphis, Tennessee, utilizing Stax producers, writers, and musicians.  In contrast to what became known as the "Motown" style of soul music or rhythm and blues ("R&B") music, Sam & Dave became associated with the "Stax" brand of soul music.

In the late 1960's, Sam & Dave released the songs "Soul Man" and "Hold On' I'm Comin'," which immediately became popular music hits.  Isaac Hayes, among others, played a role in writing and producing those songs and the albums in which they were included, including the 1967 album *Sam & Dave Soul Men* (hereinafter, "Atlantic Records Album").  Sam & Dave continued to perform together for several years before breaking up in the early 1970's.  They reunited for performances through the early 1980's, performing together for the last time in 1982.  When performing together, Sam & Dave at times wore sunglasses, dark hats, and "shark skin" suits.  They performed a combination of choreographed dance routines and spontaneous dance

33

moves on stage.  Their backup band was, at times, referred to as "The Soul Men."  In 1988, Dave Prater died.

 After Sam & Dave parted ways in 1982, Sam Moore has continued to perform and make celebrity appearances, often holding himself out as, or being referred to as, "Sam Moore 'The Legendary Soul Man,'" or some variation thereof.  He was inducted into the Rock & Roll Hall of Fame, won a Grammy for the "Soul Man" song, has appeared in several feature films, and has performed with various notable music celebrities, including Elton John, Bruce Springsteen, and others.  During certain performances, he and his backup band have been introduced as "The Soul Men and the Ladies."  He currently requests that promoters refer to him as "The Legendary Soul Man."

### B.    The Marks[14]

The plaintiffs claim to own common law trademarks in the phrases "Soul Men," "Soul Man," "The Legendary Soul Man," "The Original Soul Man," and "The Original Soul Men." These Marks are unregistered.  In 1997, Sam Moore filed an application with the USPTO concerning certain of these Marks, which the USPTO approved.[15]  However, because Sam Moore did not file the requisite follow-up Statement of Use, the Marks were not registered.

The plaintiffs have presented no evidence that they personally spent any money investing

---

[14]Whether the Marks actually constitute protectable trademarks is the subject of vigorous dispute between the parties.  The plaintiffs refer to the Marks as "marks" or "trademarks," while the defendants refer to them as the "Purported Marks."  For ease of reference only, the court will refer to them as the "Marks."

[15]It is not entirely clear to the court whether any Marks other than "Soul Man" were subject to Sam Moore's USPTO application.  Exhibit 4 to the PRDSUF purports to be Sam Moore's "trademark application file."  That document appears to contain a signed application only as to the term "Soul Man."

in and advertising or promoting the Purported Marks. However, it appears that some third-party promoters advertised performances and appearances by "The Legendary Soul Man Sam Moore" (or variations thereof), although the plaintiffs have not presented evidence reflecting the total amount of those potential expenditures.

The plaintiffs have never granted a trademark license related to the Marks. However, at least some of Sam Moore's performance agreements include a contract rider setting forth the manner in which Sam Moore is to be billed (as "The Legendary Soul Man," for instance). (*See, e.g.*, PRDSUF, Ex. 9 at p. 4, ¶ 5 ("BILLING: SAM MOORE or The Legendary Soul Man Sam Moore"; "There is to be no deviation from this billing without prior written approval by [Sam Moore's] representative. There is <u>never</u> any use allowed for any reason whatsoever to the name "Sam & Dave" in any marketing, billing, promotion or otherwise to refer and/or describe or advertise Sam Moore.") Sam Moore personally always uses his given name, Sam Moore, in connection with his stage names "Soul Man", "The Original Soul Man," and "The Legendary Soul Man." Advertisers and promoters have, at times, referred to Sam Moore by his stage name without reference to his given name.

Similarly, the record contains evidence – including evidence produced by the plaintiffs – that Sam Moore is not always referred to as the "Soul Man" and that Sam & Dave are not always referred to as the "Soul Men." For example, the American Federation of Television and Radio Artists ("AFTRA") awarded Sam Moore a Lifetime Achievement award at the AFTRA Media and Entertainment Excellence Awards ceremony ("AMEE"). In its press release concerning the AMEE awards, AFTRA devotes several paragraphs to Sam Moore without once refer to him as "The Soul Man" or some related name. (*See* PRDSUF, Ex. 11-1, at pp. 34 and 46.) Similarly,

the record contains multiple references to Sam & Dave as "Double Dynamite," rather than as "Soul Men." (*See, e.g. id.* at p. 17 (news article).) The cellophane cover of the 2008 documentary regarding Sam & Dave, in which the plaintiffs assert interests in this lawsuit, actually contains a sticker with the phrase "Double Dynamite" in large capital letters. (*See* DSUF, Ex. 8.)[16]

There are various examples of artistic media that consist or incorporate the terms "Soul," "Soul Man," "Soul Men," and variations thereof. For example:

- There are at least 34 third-party musical albums currently available for sale, the titles for which consist of or incorporate the phrases "soul men" or "soul man," such as "Soul Man" by Solomon Burke, "Soul Man" by Bill McGee, "Soul Men: Their Greatest Hits" (various artists), and "Soul Men" (various artists).

- Various performing groups (or individual performers) utilize the terms "Soul Man" or "Soul Man," such as "The Soul-Men" (1960's group), "The Soul Men" (current group), "The Soul Men" (another group of the same name), "Soulmen" (current group), and John "Soul Man" Castro.

- The Blues Brothers, originally composed of comedic actors Dan Aykroyd and John Belushi, re-recorded the song "Soul Man" and released two feature films, including the 1998 film Blues Brothers 2000, in which Moore played a backup acting role.

- Several shows have utilized the terms, including: *Soul Man*, a television sitcom starring Dan Aykroyd, and *Stories of a Real Soul Man*, a live show by David Porter, who had co-authored Sam & Dave's "Soul Man" and "Hold On I'm Comin'."

- Many articles have described entertainers other than Sam Moore/Sam & Dave as "Soul Man" or "Soul Men," including: "Soul Man," an

---

[16]The plaintiffs contend that Sam & Dave did not hold themselves out as "Double Dynamite." According to the plaintiffs, a third-party promoter simply utilized that term to describe Sam & Dave in promoting a European tour, without input or consent from Sam & Dave. Regardless of the source of the term, it appears that Sam & Dave were also referred as "Double Dynamite."

msnbc.com article regarding Ray Charles; "Soul Men," a New York Times article relating to Eugene Record and Luther Vandross; "Soul Man," describing R&B singer Sam Cooke; "Two Soul Men, Reunited for the First Time," an npr.org article describing former Stax backup recording artists Steve Cropper and Felix Cavaliere; and "Great Soul Men, Gone too Soon," a Yahoo! music blog article concerning various artists, such as Dave Ruffin (Temptations), Marvin Gaye, Otis Redding, Quincy Jones, and Michael Jackson.

• At least two feature films have utilized the term "Soul Man": (1) the 1986 film *Soul Man*, which concerns a white student who darkens his skin color in an attempt to attend Harvard University, for which Sam Moore re-recorded the song "Soul Man" with Lou Reed and appeared in the film; and (2) the 2007 independent film *Soul Man*.

With respect to the examples listed in the Harvey Declaration, the parties appear to agree that many of the references do not constitute independent trademark uses, except as to the names of performance artists.

Notwithstanding the fact that many entertainers, books, albums, movies, and other media have utilized the term "Soul Man" or "Soul Men," this lawsuit is the only time that Sam Moore has ever made any demands on any third party regarding the use by that third party of the phrase "soul man" or "soul men."

The plaintiffs have not presented any consumer surveys regarding the public's association of the Marks with Sam Moore.[17]  The plaintiffs have never received any income for, or related to, the Marks.  Furthermore, the plaintiffs have not presented evidence regarding the total amount, if any, that they have spent advertising or otherwise promoting the Marks.

## C. The Defendants and the 2008 Movie *Soul Men*

---

[17]Even if the Simson Report were not excluded, this fact would remain undisputed.  The Simson Report does not purport to survey members of the consuming public regarding their association of the Marks with Sam Moore.

In 2008, Dimension Films, a division of TWC, released the movie *Soul Men*, starring Samuel L. Jackson and Bernie Mac. Pursuant to a global distribution agreement with TWC covering multiple films, MGM distributed *Soul Men* in movie theaters nationwide. After the Movie's brief theatrical run, Genius Products manufactured and distributed DVD and Blu-Ray versions of *Soul Men*, pursuant to a global agreement with TWC covering all TWC home videos in the United States. Pursuant to a March 2008 agreement with TWC, Concord distributed the *Soul Men* Soundtrack.

Matthew Stone and Robert Ramsey wrote the *Soul Man* screenplay. Stone first became involved in the project when he received a phone call from an agent informing him that Bernie Mac and Samuel L. Jackson intended to do a movie project together. Mac and Jackson's initial concept was to make a movie about competing barbecue stands. Stone and Ramsey did not like this particular idea, so they suggested another story line: "[O]ff the cuff, one of us said, and I don't recall – we operated almost as a single unit . . . [,] [o]ne of us said something to the effect of 'what if these guys were like old backup singers, like the "Pips", and their lead singer had died, and they had to get back together. They hated each other and they had to get back together.'" (DSUF, Ex. 23 at 17:12-23.)

Based on this concept, Stone and Ramsey began drafting a screenplay involving two back-up singers whose former lead singer had died. At the time he began working on writing the script, Stone was only broadly familiar with Sam & Dave (among other soul music artists from that era), including the fact that Sam & Dave were associated with Memphis and the Stax record label. During the scriptwriting phase, Stone and Ramsey viewed various videos of performers in the 1960's and 1970's, including Marvin Gaye, George Clinton, Wilson Pickett, and a single

black and white video of Sam & Dave performing an unspecified song. With respect to the Pips – who performed as backup singers to Gladys Knight – Stone (mistakenly) believed that there were two Pips and, at any rate, he did not conduct any research of the Pips drafting the script. Stone did not testify that he intended to base *Soul Men* on the lives or history of Sam & Dave – or, for that matter, on the lives of any particular musical artists. Indeed, when Stone and Ramsey pitched the Movie to studios, they did not expressly reference Sam Moore or Sam & Dave.

In July 2006, Stone and Ramsey entered into an agreement with Katja Motion Picture Corporation (part of New Line Cinema) ("Katja Corp.") related to the project, which was then referred to as the "Untitled Backup Singers Project." David Friendly, who ultimately directed the Movie, subsequently obtained contractual rights to the project. In June 2007, a Hollywood agent (apparently acting without David Friendly's authority), contacted Harvey and Bob Weinstein at TWC by email, stating as follows:

> With your coffers overflowing, I wanted to alert you to a project that we're involved in that may be of interest. The screenplay for "Soul Men" is in turnaround at New Line; think "Sunshine Boys", "Blues Brothers" and "Planes, Trains, and Automobiles"; two Sam and Dave-like soul singers who loathe each other have to reunite and travel together across the country.

(PRSDUF, Ex. 17.) Harvey Weinstein stated that he was interested in reading the script, which the agent sent to him. By the time the Weinsteins/TWC became aware of the project, the title "Soul Men" had already been selected, the concept for the Movie had been established, and a version of the script had been written.[18]

---

[18]The plaintiffs state that no one associated with the Movie "would admit" to titling the script, which they contend "raises a serious factual question about the origin and meaning of the title from Defendants' perspective that cannot be resolved without a jury's determination." (PRSDUF at p. 30, Response to ¶ 112.) The court has examined the referenced testimony, which merely establishes that Stone and Friendly could not recall who titled the Movie. The court does

In September 2007, TWC, through its Dimension Films Division, purchased the rights to the screenplay of the Movie (which was referred to in the contract as "'Soul Men' f/k/a 'untitled backup singers project'") from Katja Corp. Filming for the Movie took place between January 22 and April 1, 2008. Not including pre- and post-production time, 35 days of filming took place in Shreveport, Louisiana, 4 days in Memphis, Tennessee, and 3 days in Los Angeles, California. It is unclear how many hours, if any, of pre- and post-production time took place in Tennessee.[19] TWC began promoting *Soul Men* as early as February 2008, apparently before filming had finished.

The Movie concerns a road trip involving Samuel L. Jackson's character, Louis Hinds, and Bernie Mac's character, Floyd Henderson. The Movie opens with a faux biographical documentary of a fictional music group called "Marcus Hooks and The Real Deal," comprised of lead singer Marcus Hooks and backup singers "The Real Deal" (*i.e.*, Hinds and Henderson). An opening segment shows the group singing the song "I'm Your Puppet" (not a Sam & Dave

_____

not interpret their inability to recall this particular detail as creating a "serious" factual dispute about the creative process behind the Movie, on which Stone and Friendly (among other witnesses) otherwise provided detailed testimony.

[19]At PRSDUF Response to ¶ 115, the plaintiffs state that TWC's *Soul Men* budget reflects "many additional days and man hours spent in Tennessee related to production." In support of this contention, the plaintiffs refer to Ex. 31 to the PRDSUF, which contains 92 pages of excerpts from the TWC *Soul Men* budget, including line items with associated hours and billing rates for various Movie-related personnel. With respect to this 92-page document, the plaintiffs do not identify any specific pages or line items that allegedly support their factual representation. Nevertheless, having conducted its own analysis of the excerpted pages, the court finds that the plaintiffs' representation appears to be unsupported. To the contrary, the entries appear to reflect the defendants' representation that the vast majority of the production process took place outside of Tennessee. (*See, e.g.*, PRDSUF, Ex. 31 at p. 47 (budget entry for "Tailor/Seamstress," reflecting, *inter alia*, approximately 14.8 weeks of "prep" and "shoot[ing]" in Louisiana and California, but just 0.6 weeks of "shoot[ing]" in Tennessee)).

original) and then, in a montage, shows the group members' "Afro" hairdos getting bigger and their clothing more outrageous during the 1970's, to comedic effect.  According to the fictional documentary, in 1977 Hooks went on to pursue a successful solo career.  By contrast, Hinds and Henderson released only one single as "The Real Deal," titled "A Walk in the Park" – a song that in fact was an original recording by Jackson and Mac created specifically for the Movie.  In 1979, The Real Deal disbanded because of a personal feud, after which Hinds robbed a bank, was imprisoned, and later became a mechanic.  Floyd opened a soul-themed car wash.

The Movie then switches to the present day, when Hooks dies suddenly.  After having not spoken to each other in 30 years Hinds and Henderson meet in Los Angeles, where Hinds was living, and decide to reunite as "The Real Deal," intending to sing at a memorial tribute show for Hooks at the Apollo Theater in New York City.  Because Hinds refuses to fly in an airplane, the Movie follows "The Real Deal" on a cross-country road trip from Los Angeles to New York.  Early in the Movie, Hinds and Hooks perform "Hold On' I'm Comin'" before a small crowd at a stage in Flagstaff, Arizona, after which they perform several non-Sam & Dave songs at other venues on the way to New York.  During their road trip, they encounter a young woman named Cleo, who is believed to be Henderson's daughter by a previous wife, but who turns out to be Hinds' daughter born out of wedlock to Henderson's wife.  Hinds and Henderson ultimately reconcile and, at the end of the Movie, perform together with Cleo at the Apollo.  The Movie includes a cameo by Isaac Hayes, who had co-authored and produced "Soul Man" and "Hold On' I'm Comin'" with Sam & Dave in the 1960's.  At all times in the Movie, Jackson's character Hinds, whom the plaintiffs allege actually portrays Sam Moore, is a single man and a bachelor.

The Movie contains an excessive amount of cursing, including the "f" word, derogatory terms for women, and racially charged curse words spoken by Jackson's character.

The plaintiffs have pointed out certain similarities between *Soul Men* and the real lives of Sam & Dave:

- Sam Moore had multiple children out of wedlock and the Hinds character has a daughter out of wedlock;

- Sam & Dave are both African-American soul singers, like The Real Deal;

- Sam & Dave were a male-male duo, like The Real Deal;

- Sam & Dave were not related in real life and neither were the members of The Real Deal;

- Sam & Dave at times traveled by car and the Movie involves a cross-country road trip;

- Sam & Dave were Stax singers who achieved fame through Memphis-based recordings, as did the fictional band "Marcus Hooks and The Real Deal";

- The Movie features a scene at Memphis's Peabody Hotel, where Sam Moore often stayed;

- The Movie culminates with a scene at The Apollo Theatre, where Sam Moore often performed;

- Hinds and Henderson perform "Hold On' I'm Comin'," which is a Sam & Dave song, and Jackson's character utilizes an *ad lib* catch-phrase contained in the original recording by Sam & Dave;

- Sam & Dave wore brightly colored clothing and "shark skin" suits, as, at times, The Real Deal members did when performing in the Movie;

- Sam & Dave often wore sunglasses and hats, as The Real Deal members did in the Movie;

- Sam & Dave disbanded after having internal disagreements and then reunited, just like the characters in the Movie;

- The characters in the Movie "danced with character and enthusiasm," much like Sam & Dave did;

- Isaac Hayes, who plays a former associate of The Real Deal in the Movie, was, in real life, a songwriter and producer/arranger for Sam & Dave.

The plaintiffs also point out that marketing materials for the Movie promoted Hinds and Henderson's character as a "legendary duo," and that trailers and advertising for the Movie included the song "Hold On' I'm Comin'." Based on these and other similarities, the plaintiffs allege that Samuel L. Jackson's character in *Soul Men*, Louis Hinds, was based specifically on Sam Moore and that Bernie Mac's character was based on Dave Prater. The plaintiffs also contend that the defendants marketed the Movie and its Soundtrack to capitalize on the potential association between the title "*Soul Men*" and Sam Moore's alleged "Soul Men" trademark.

Notwithstanding these broad similarities, the Movie contains no direct references to "Sam & Dave" or "Sam Moore." Sam Moore's name is never mentioned in the Movie, nor does the Movie contain any photographs or images of Sam Moore or Sam & Dave. The Movie begins with a disclaimer that "The persons and events in this motion picture are fictitious. Any similarity to actual persons or events is unintentional." The Movie does not contain any "Sam & Dave" recordings; the only Sam & Dave song in the film is the cover version of "Hold On I'm Comin'", performed by The Real Deal (*i.e.*, Jackson and Mac). The Movie contains various original recordings of musical performances by *other* R&B artists, covers of several *non*-Sam & Dave songs by The Real Deal, and the original song "A Walk in the Park," which was recorded by Jackson and Mac specifically for the Movie.

There are also various patent differences between the real lives of Sam & Dave and the Movie's The Real Deal characters and plotline.

- The Real Deal members were simply backup singers to a famous lead singer, whereas Sam & Dave achieved their fame performing as lead singers;[20]

- Sam & Dave never reunited to perform at the funeral of a former lead singer – the basic impetus behind the Movie's plot – because they never backed up a lead singer in the first place;

- There is no evidence that Sam & Dave ever reunited to take a cross-country road trip before Dave Prater's death in 1988 (20 years before *Soul Men* is set);

- There is no evidence that Sam & Dave ever took a cross-country road trip from Los Angeles to The Apollo Theater before, during, or after they reunited, even though the bulk of the Movie's running time relates to such a road trip by The Real Deal;

- There is no evidence that, after reuniting, Sam & Dave were forced to take a road trip because Sam Moore refused to fly in planes, even though Hinds' refusal to fly in planes serves as the catalyst for the The Real Deal's road trip. To the contrary, Sam Moore has often flown in planes to make international appearances and appears to continue to do so;

- Unlike Sam Moore, who has been married to Joyce Moore for 25 years, Jackson's character Hinds is a lifetime bachelor;

- Unlike Hinds (Jackson's character), Sam Moore did not become a mechanic after his soul music group disbanded – instead, he continued (and continues) to perform as a musician;

- Unlike Henderson (Mac's character), Dave Prater did not become a soul-themed carwash owner after his soul music group disbanded – instead, like Sam Moore, he continued to perform as a musician;

- Unlike the Hinds character, there is no evidence that Sam Moore has ever resided in California – whether in 2008 (when the Movie is set) or in any other year;

- There is no evidence that Sam & Dave ever performed with Sam's

---

[20]Apparently, Sam & Dave *once* sang backup to Carla Thomas on a single television special. With the exception of this one instance, it appears that Sam & Dave performed and achieved popularity exclusively as lead singers.

daughter or Dave's daughter – or that either artist even had a daughter who performed music – even though the climactic scene in the Movie involves a dramatic song collaboration between The Real Deal and Cleo (Hinds' daughter) at The Apollo Theatre..

The plaintiffs have not presented evidence that the consuming public actually believes that Sam & Dave or Sam Moore approved the Movie or that it constitutes a "life history" of Sam & Dave.

None of the marketing materials for the Movie mention or contain photographs of "Sam & Dave" or "Sam Moore."  Nevertheless, the plaintiffs contend that these materials sought to mimic the "likeness" of Sam & Dave.

## D.     Samuel L. Jackson's Testimony

At deposition, Jackson denied having based the Hinds character on Sam Moore.  He testified that no one told him to base his role in the Movie on Sam & Dave/Sam Moore, that he did not base his dancing moves on "Sam & Dave" dance moves, that he wore sunglasses in certain scenes because they were similar to shades that he often wears, that he had never seen a live performance by Sam & Dave or Sam Moore before filming the Movie, and that he chose to wear hats to emulate "older men" who wore those types of hats.[21]  Essentially, Jackson disclaimed that he had any intention to specifically portray Sam Moore – or any particular musical artist – in the Movie.

As the plaintiffs point out, Jackson admitted that he listened to Sam & Dave songs growing up, that he had Sam Moore over to his home at least once, and that, in early 2007, he

---

[21]*See, e.g.*, Docket No. 308, Ex. 32 at 58:9-59:4 ("Q: Where did these ideas come from? A: Older men that I know in my life who wear hats like this.  And I always wear Ray-Bans [sunglasses] like that.  If I had my shoulder bag with me, I could pull out a pair right now and show them to you.")

had narrated a PBS-TV documentary by Concord called "Respect Yourself: The Stax Records Story," which includes segments in which Sam & Dave perform and dance to "Soul Man" and "Hold On I'm Comin'" – among performances by numerous other artists. Jackson has testified that, although he narrated the PBS special, he did not actually view the final film. Consistent with his customary practice, he simply recorded the narrative in a studio and never watched the documentary, even though it contained his voice. The plaintiffs also point out that Jackson testified that he and Mac performed "Hold On' I'm' Comin'" in the Movie without special preparation – apparently from memory.

The plaintiffs contend that the court should not accept any of Jackson's testimony as true for purposes of summary judgment, apparently based on their belief that Jackson's testimony regarding the PBS special and the performance of "Hold On' I'm Comin'" from memory are so dubious as to place all of his testimony in doubt. Although the plaintiffs argue that the court should not accept the "credibility" of Jackson's testimony at this stage, the plaintiffs have not cited to evidence contradicting Jackson's sworn testimony. Moreover, the court finds no inconsistencies in Jackson's testimony, either internally or with respect to other sworn testimony. Thus, the court will – as it must at this stage – rely on the uncontradicted facts.

### E. Sam Moore's Objections to the Movie

In October 2007, the plaintiffs received a copy of the Movie's script, which at the time was under the working title "*Soul Men*." After ascertaining information about the content of the film, Sam Moore gave media interviews in which he expressed that the Movie was a "rip off" of his life history. The plaintiffs also drafted a press release calling the Movie "fake." Roger Friedman, an American entertainment news journalist and professional colleague of the Moores,

contacted TWC multiple times to express concerns with the content of the Movie and the fact

that it did not include Sam Moore.[22]  Sam Moore's counsel also sent a number of letters to TWC

expressing Sam Moore's concern that the Movie, if released, would infringe his rights in the

Marks and portray him in a false light.  TWC offered Sam Moore a cameo role in the film, which

was nearing the end of production, but Sam Moore declined the offer as "insulting."

Notwithstanding Sam Moore's objections, TWC released the Movie as scheduled.

###    F.    The Soundtrack

During filming, TWC apparently negotiated with a number of record labels for the rights

to produce the Soul Men Soundtrack.  (*See* DSUF, Ex. 41.)  On March 1, 2008, TWC entered

into an agreement with Concord for production of the Soundtrack.  By that time, the songs

performed in the Movie by Jackson and Mac, some of which were included on the Soundtrack,

had already been recorded.  In conjunction with the release of the Movie, the Soundtrack was

released on November 4, 2008.  The Soundtrack included an insert which stated that "The

Original Soul Men are at Stax," which plaintiffs contend violated their trademark rights to "The

Original Soul Man."

---

[22]*See, e.g.*, PRDSUF, Ex. 29 at p. 7, 10/31/07 Email from Friedman to TWC ("I see the script has the two 'soul men' in essence cribbing from the Sam & Dave story . . . . What's worse, they wrote in Isaac Hayes as a character! . . . . [T]o feature him and not Sam would really be terrible . . . . The one thing that shouldn't happen here is for the audience to think this is the real Sam & Dave story.  Sam has his own great story to tell . . . . [H]e is 'Soul Man' the way James Brown was 'Godfather of Soul.'  There's only one Soul Man."); *id.* at p. 4, 2/4/08 email from Friedman to TWC Representatives ("Just looking at this script, there are several references to Sam & Dave . . . . [H]ow would you feel if someone made a movie about two brothers who started a movie company?  And named it after their parents?  You get the drift.").  Harvey Weinstein responded to the 10/31/07 email from Friedman as follows: "Dear Roger: This is about backup singers.  I think you are reading into it way too much.  I do agree it would be nice to have Sam in there as a cameo, but this [movie] is about grumpy old men."  (*Id.* at p. 7.)

The Soundtrack features twelve recordings sung by Jackson and Mac, Isaac Hayes, Anthony Hamilton, John Legend, Sharon Jones and the Dap Kings, Eddie Floyd, and others. The Soundtrack contains new music and old music made popular in the late 1960's and early 1970's. The Soundtrack does not include any sound recording of Sam Moore or Sam & Dave. Furthermore, the Soundtrack does not include the songs "Soul Man" (which was not performed in the Movie) or "Hold On' I'm Comin'" (even though it was performed by The Real Deal in the Movie).

The Soundtrack does not contain the names "Sam Moore" or "Sam & Dave," nor does it include any photographs of Sam Moore or Sam & Dave. The cover of the Soundtrack contains a photograph of Jackson and Mac and identifies them by name in text above that photograph. Notwithstanding the absence of any explicit references to Sam Moore or Sam & Dave, plaintiffs argue that the dress and appearance of Jackson and Mac on the cover of the Soundtrack and the reference to "The Original Soul Men Are at Stax" effectively "take Sam Moore's likeness." (*See* PRDSUF at p. 48, ¶ 186.)

The plaintiffs have not presented any direct evidence that anyone actually believes that Sam & Dave approved the Soundtrack or that any consumers purchased the Soundtrack believing that they were purchasing a "Sam & Dave" album. Sam Moore testified at deposition that the Soundtrack did not harm his reputation. (*See* DSUF, Ex. 1 at 233:15-21.)

MGM and Genius Products did not participate in creating or distributing the Soundtrack.

G.      **The Titles: the 1967 Album and the Atlantic Records Album**

The 1967 Atlantic Records Album *Sam & Dave Soul Men* contains Sam & Dave original recordings, including "Soul Man." Atlantic Records retains all rights to the Sam & Dave

"masters" (*i.e.*, the master recordings of their original performances). Thus, the plaintiffs have no control over how the Atlantic Records Album is currently distributed or licensed. Although the plaintiffs are broadly aware of the popularity of the song "Soul Men" and the album *Sam & Dave Soul Men*, the plaintiffs have no personal knowledge of sales, inventory, marketing, or revenue related to the Atlantic Records Album. Furthermore, Sam Moore did not choose to title the Atlantic Records Album as "Sam & Dave Soul Men," nor did Sam Moore choose to title the song "Soul Men." The plaintiffs have not produced evidence that Sam Moore retains any property rights or direct financial interests in the Atlantic Records Album. Nevertheless, he appears to assert some form of trademark interests in the title of that album.

In December 2008, Historic Music, Inc. and Universal Music Enterprises released a DVD in the United States concerning Sam & Dave, entitled "*The Original Soul Men Sam & Dave DVD*." (Hereinafter "Historic Films DVD.")[23] Historic Music, Inc., under an exclusive license to Universal Music Enterprises, holds the copyright to this DVD. Universal Music Distribution is the distributor of the Historic Films DVD. The DVD, which was not released in theaters in the United States, is a documentary about Sam & Dave.

In October 2007, well before the DVD was released, Sam Moore and Historic Films entered into an agreement in which Sam Moore granted Historic Films the right to utilize audio and visual images of him in the documentary, as well as "the trademark for 'Sam & Dave' that I own and control . . . ." (DSUF, Ex. 44 at p. 1.) In return, Sam Moore received $7,500.00 and the

---

[23]The plaintiffs state that Universal Films UK released the DVD. Although it is not entirely clear from the face of the DVD whether this is correct, this factual distinction is essentially irrelevant. Without making a factual finding as to which entity actually released the DVD, the court will refer to the DVD as the "Historic Films DVD."

right to receive 25% of any gross royalty received by Historic Films in connection the DVD. The agreement does not explicitly reference the "Soul Man" Mark. It does not appear that Sam Moore actually received any compensation other than the $7,500.00 up-front payment.

"*The Original Soul Men Sam & Dave*" was not the original title of the Historic Films DVD; instead, it appears that the Movie's producers adopted the title at Joyce Moore's behest.[24] At any rate, the face of the DVD contains "The Original" in small white letters, "Soul Men" directly below in slightly larger white font, and "Sam & Dave" below that, in much larger stylized yellow letters.

The plaintiffs broadly allege a "competing titles" claim relative to the 1967 Atlantic Records Album and the 2008 Historic Films DVD (collectively, the "Titles").

## H. Additional Facts Relating to Choice of Law

Sam Moore and Joyce Moore are Arizona residents who have maintained a home in Arizona for approximately 25 years. The SJM Trust – albeit an improper plaintiff – is an Arizona irrevocable trust.

Joyce Moore, who acts as Sam Moore's manager, has largely managed his business affairs out of their domicile in Arizona. For example, in connection with managing the business affairs of Sam Moore and other artists, Joyce Moore has operated several entities or "dba's" out of the Moores' Arizona domicile.[25]

---

[24]Documentary evidence in the record suggests that, by this point, Joyce Moore had learned of the *Soul Men* movie title and may have hoped to capitalize on the feature film's success by giving the Historic Films DVD a similar title. (*See* Docket No. 308, Ex. 45.)

[25]One of these entities, "I'ma Da Wife Enterprises," was incorporated in Tennessee in 1999 but was apparently dissolved in 2002. (*See* PRDSUF ¶ 8; Docket No. 357.) The plaintiffs do not dispute that Joyce Moore operated this entity out of her Arizona domicile.

In addition to their Arizona home, the Moores also maintained a residence in Nashville, Tennessee, from 1993 through 2000.  Joyce Moore continues to utilize at least one cell phone number with a Tennessee-based "615" area code.  The Moores occasionally receive mail addressed to them in Nashville, care of Frederick Wilhelm III, who served as Trustee of The SJM Trust and as legal counsel to the Moores.  It appears that Wilhelm has simply forwarded these mailings to the Moores in Arizona.

Sam Moore has recorded a number of albums in Tennessee, has performed in Tennessee numerous times, and has appeared at various Tennessee functions and events.  At the time he filed this lawsuit, his publicist was based in Tennessee, as was his agent.

## SUMMARY JUDGMENT STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (2011).  At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record that demonstrate the absence of any genuine issue of material fact.  *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may meet its burden by showing that there is an absence of evidence to support the non-moving party's case.  *Id.* (citing *Celotex*, 477 U.S. at 325).  "When the moving party has carried this burden, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'"  *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d

538 (1986).)  The non-moving party also may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial.  *Id.*

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Moldowan*, 578 F.3d at 374 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  "In evaluating the evidence, the court must draw all inferences in the light most favorable to the nonmoving party."  *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587).  But "[t]he  mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient," *Moldowan*, 578 F.3d at 374 (quoting *Anderson*, 477 U.S. at 252), and the non-movant's proof must be more than "merely colorable."  *Anderson*, 477 U.S. at 249.  An issue of fact is "genuine" only if the record taken as a whole could lead a rational trier of fact to find for the non-moving party.  *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587).

## ANALYSIS OF NON-MERITS THRESHOLD ISSUES
## PRESENTED BY MOTION FOR SUMMARY JUDGMENT

## I.    General Lack of Clarity

In their claims (and associated arguments), the plaintiffs have largely failed to distinguish whether and how their claims relate to the Marks, the Titles, or both.  Similarly, the plaintiffs assert each of their claims against all defendants, even though each defendant played a distinct role relative to the Movie and/or Soundtrack.  Furthermore, the plaintiffs often refer interchangeably to rights held and/or asserted by "Sam Moore" and rights asserted and/or held by  "the plaintiffs," even though the nature of each's plaintiff's rights (whatever they may be) are

52

legally distinct.  This blunderbuss approach at times has made it difficult to ascertain the precise

nature of a particular claim, by whom is it is being properly asserted, and to which defendant(s)

that claim even conceivably applies.  In its analysis below, the court has endeavored to draw

those distinctions, where relevant.

## II.  Claims by "The Plaintiffs"

The plaintiffs largely have pleaded and argue their claims in collective terms.  However,

the defendants argue that the plaintiffs have not shown that Joyce Moore or The SJM Trust have

any interests to assert in this lawsuit.  (*See* Defs. SJ Mem. at p. 3 n.4.)

With respect to Joyce Moore, the defendants state as follows:

Plaintiff Joyce Moore claims to be asserting <u>some</u> claims as the wife and manager of Mr. Moore on the basis that she is a resident of Arizona, which she says is a 'community property' state (despite repeated inquiries during discovery, the specific claims asserted by Ms. Moore remain unclear).  The report provided by Plaintiffs on damages does not identify any damages particular to Joyce Moore, and she has not shown an individual interest in any of the claims asserted.

(*Id.*) (emphasis in original) (internal citations omitted).  With respect to The SJM Trust, the

defendants state as follows:

*The SJM Trust has revealed itself to be a sham entity and litigant*.  It is an <u>Arizona</u> trust, not a Tennessee trust as alleged in the pleadings.  SJM has not complied with any formal or other requirements set forth in the trust document or under law (for example, no annual reports or tax filings have been made).  On more than one occasion in written discovery responses, Plaintiffs have sworn that SJM is the owner of the intangible common law trademark rights asserted in this lawsuit.  SJM has no – and never had any – relationship to Tennessee . . . .  After SJM's 30(b)(6) deposition, Plaintiffs agreed to dismiss SJM with prejudice, but failed to enter into a stipulation of dismissal under Fed. R. Civ. P. 41 as directed by Magistrate Judge Brown.

(*Id.* (emphasis added); *see also* Docket No. 373 at p.10 n.10 and pp. 16-17.)[26]

In their Response, the plaintiffs fail to address any of the defendants' contentions regarding the viability of claims by Joyce Moore and The SJM Trust. The plaintiffs' silence in response to the defendants' arguments regarding Joyce Moore and The SJM Trust constitutes implicit abandonment of those plaintiffs' claims, thereby justifying summary judgment on that basis alone. *See Gibson-Homes v. Fifth Third Bank*, 661 F. Supp. 2d 905, 912 (M.D. Tenn. 2009); *Perry v. Hoeganaes Corp.*, No. 3:04-cv-0525, 2005 WL 1875090, at *6 (M.D. Tenn. Aug. 5, 2005).

Regardless, the plaintiffs simply continue to refer to the allegations in collective terms, without identifying evidence or a legal theory showing that Joyce Moore or The SJM Trust have cognizable interests to assert in this lawsuit – such as trademark rights, a right to privacy, and/or a right of publicity. Indeed, as the court noted in its May 11, 2012 Memorandum, the plaintiffs have essentially acknowledged that The SJM Trust should be dismissed from this lawsuit. (*See* Docket No. 373 at p. 18, n.19.) Similarly, the plaintiffs tellingly have made no particularized rebuttal to defendants' argument that Joyce Moore also is an improper plaintiff.

For these reasons, the court finds that the defendants are entitled to summary judgment on all claims by Joyce Moore and The SJM Trust.[27ʼ]

### III.    Choice of Law Relative to State Law Claims

---

[26]As of the date of this Memorandum, the plaintiffs still had not filed a Rule 41 Motion for Voluntary Dismissal. Nevertheless, they have briefed their Response to the Motion for Summary Judgment without acknowledging any issues concerning The SJM Trust.

[27]Even if Joyce Moore and The SJM Trust had cognizable interests to assert, the defendants would be entitled to summary judgment for the same reasons that they are entitled to summary judgment on all claims by Sam Moore, as detailed hereafter.

## A.      Legal Standard and the Parties' Positions

Sam Moore pleaded the following claims under Tennessee law: (1) a right of publicity claim under the TPRPA and Tennessee common law (Count I); (2) false light invasion of privacy (Count II); (3) an alleged violation of the TCPA (Count IV); (4) common law unfair competition (Count V); (5) unjust enrichment (Count VI); (6) civil conspiracy (Count VIII); and (7) alleged trademark dilution under the TTMA (Count IX).  The defendants argue that, under choice of law principles, Tennessee law does not actually apply to certain of these claims, thereby warranting their dismissal.

A federal court sitting in diversity must apply the choice-of-law rules of the forum state, in this case, Tennessee.  *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009); *MacDonald v. Gen. Motors Corp.*, 110 F.3d 337, 341 (6th Cir. 1997).  As an initial matter, a court need not make a choice of law if there is not a real difference or conflict in the relevant laws of the states involved, and application of either state's laws produces the same result.  *See Armstrong v. U.S. Fire Ins. Co.*, 606 F. Supp. 2d 794, 802 (E.D. Tenn. 2009) (citing *Hataway v. McKinley*, 830 S.W.2d 53, 59 (Tenn. 2002)); *Bearden v. Honeywell Int'l., Inc.* No. 3:09-01035, 2010 WL 1223936, at *6 n.7 ("Choice of law is only relevant, of course, if the state laws at issue conflict with each other.").  However, where a conflict exists, Tennessee follows the "most significant relationship" approach of the Restatement (Second) of Conflict of Laws as to choice-of-law questions.  *Montgomery*, 580 F.3d at 459 (citing *Hataway*, 830 S.W.2d at 59).

The manner in which the parties have briefed the choice of law issues is not a model of clarity.  Nevertheless, having analyzed the briefing, the court interprets the parties' positions concerning choice of law issues as follows:

- <u>Right of Publicity</u>: (1) The parties dispute whether there is a conflict between Arizona and Tennessee law; and (2) if there is a conflict, the parties dispute whether, under choice of law principles, Arizona or Tennessee law should apply to the publicity claims;

- <u>TCPA and TTMA</u>:  There is a conflict of laws relative to the TCPA and TTMA claims,[28] but the parties dispute whether, under choice of law principles, Arizona or Tennessee law should apply to those claims.

- <u>Unjust Enrichment</u>:  The defendants concede that, because both states utilize similar legal standards, there is no conflict of law and Tennessee law governs this claim.

- <u>Unfair Competition</u>: The defendants do not contest that Tennessee law governs this claim.

- <u>False Light</u>:  The defendants concede that, because Arizona and Tennessee have both adopted the Restatement approach, there is no conflict of law and Tennessee law governs this claim.

- <u>Conspiracy</u>:  The parties dispute whether there is a conflict of law and whether, if so, Arizona or Tennessee law should apply.

Accordingly, the court will analyze choice of law issues with respect to the right of publicity claim, the TCPA claim, the TTMA claim, and the conspiracy claim.

**B.      Choice of Law Analysis by Claim**

   (1)      <u>Right of Publicity</u>

        a.      Whether the Publicity Claim Presents a Conflict

Arizona statutory law only recognizes a right of publicity for active and former members of the United States armed forces.  *See* Ariz. Rev. Stat. § 12-761 (2012).  No Arizona state court

---

[28]The plaintiffs have argued that there is no conflict of law between Arizona and Tennessee relative to the right of publicity claim.  They conclusorily assert that this argument "applies equally" to the TTMA and TCPA claims.  (Pltfs. SJ Resp. at p. 16 n.25.)  However, the TTMA and TCPA claims are substantively distinct from the right of publicity claim; thus, a comparative conflicts analysis of Arizona and Tennessee law concerning the right of publicity does not bear on the TTMA and TCPA analysis.

has recognized a common law claim for the right of publicity.  However, federal district courts

for the District of Arizona have held that there is "no reason why a claim for invasion of the right

of publicity should not be recognized in Arizona," and therefore adopted the Restatement

approach.  *Pooley v. Nat'l Hole-In-One Ass's*, 89 F. Supp. 2d 1108, 1112 (D. Ariz. 2000)

(adopting right of publicity as defined Restatement (Second) of Torts § 652 and Restatement

(Third) of Unfair Competition § 46); *see also Lemon v. Harlem Globetrotters Int'l, Inc.*, 437 F.

Supp. 2d 1089, 1100 (D. Ariz. 2006) (adopting *Pooley* Restatement approach); *Roth v. Naturally*

*Vitamin Supplements, Inc.*, No. CV-04-2135-PHX-FJM, 2006 WL 988118, at *3-*4 (D. Ariz.

Apr. 14, 2006) (same).  Thus, at least according to the *Pooley, Lemon*, and *Roth* courts, Arizona

law would define infringement of the right of publicity as appropriation of "the commercial

value of a person's identity by using without consent the person's name, likeness, or other

indicia for purposes of trade," resulting in injury.  *See, e.g., Pooley*, 89 F. Supp. 2d at 1111-12

(quoting Restatement (Third) of Unfair Competition § 46)).  The Arizona common law publicity

claim does not create criminal penalties or authorize seizure, forfeiture, impounding and

destruction.

    In contrast to Arizona law, Tennessee recognizes a statutory right of publicity under the

TPRPA (as well as a coextensive common law right), as follows:

> Any person who knowingly uses or infringes upon the use of another individual's
> name, photograph, likeness in any medium, in any manner directed to any person
> other than such individual, as an item of commerce . . . shall be liable to a civil
> action.

Tenn. Code Ann. § 47-25-1105(a) (2012); *see also Gauck v. Karamian*, 805 F. Supp. 2d 495,

500 n.5 (W.D. Tenn. 2011) (stating that TPRPA and common law publicity rights are

"coextensive").  The TPRPA defines the property rights subject to a right of publicity claim, the

persons entitled to protection, assignability and descendability, the types of uses that are infringing, and exemptions and fair uses. *See* Tenn. Code Ann. § 47-25-1101 *et seq.* The statute also provides criminal penalties for violations; authorizes injunctions, seizure and forfeiture, and impounding and destruction; and permits actual damages and disgorgement of profits. *Id.* The TPRPA is "narrowly drawn" to have a particular scope, "proscribing only the unauthorized use of another's name or likeness in advertising." *Gauck*, 805 F. Supp. 2d at 500 (citing *Apple Corps, Ltd. v. A.D.P.R., Inc.*, 843 F. Supp. 342, 347 (W.D. Tenn. 2011)). Thus, "*Tennessee's right of publicity is narrower than the Restatement approach* adopted by other states." *Gauck*, 805 F. Supp. 2d at 500 (emphasis added).

The Tennessee right of publicity differs substantively from the Arizona common law right of publicity in terms of scope, remedies, and applicable law (*i.e.*, citations to the Restatements would be of limited, if any, persuasive value in applying Tennessee law). Therefore, the court finds that there is a conflict of laws with respect to the right of publicity claim. Accordingly, the court will undertake a conflict of laws analysis with respect to this claim, as well as with respect to the TTMA and TCPA claims.

(b)    Choice of Law Analysis

Section 145 of the Restatement (Second) of Conflict of Law provides:

(1)    The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2)    Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a)    the place where the injury occurred,
(b)    the place where the conduct causing the injury occurred,

58

<blockquote>

(c)      the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d)      the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

</blockquote>

*See Bearden*, 2010 WL 1223969, at *6 (citing *Hataway*, 830 S.W.2d at 59) (applying Restatement factors to Tennessee choice of law analysis).[29]

The Restatement also indicates that, where publicity and/or privacy are at issue with respect to an "aggregate communication" that causes damage in multiple states, "the state of most significant relationship will usually be *the state where the person was domiciled* at the time, if the matter complained of was published in that state." *See* Restatement (Second) Conflict of Laws §§ 150(2), 151 and 151 cmt. c., and 153 ("The rights and liabilities that arise from matter that invades a plaintiff's right of privacy and is contained in . . . exhibition of a motion picture . . . are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties under the

---

[29]Section 6(2) of the Restatement (Second) of Conflict of Law, which is incorporated by reference into § 145(a), articulates the following additional factors relevant to the choice of the applicable rule:

      (a)      the needs of the interstate and international systems,

      (b)      the relevant policies of the forum,

      (c)      the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

      (d)      the protection of justified expectations,

      (e)      the basic policies underlying the particular field of law,

      (f)      certainty, predictability and uniformity of result, and

      (g)      ease in the determination and application of the law to be applied.

*See Hataway*, 830 S.W.2d at 59; *MacDonald*, 110 F.3d at 342.

principles stated in § 6. *This will usually be the state where the plaintiff was domiciled at the time* if the matter complained of was published in that state.") (emphasis added)

The parties have not identified any case in which a court has addressed how to determine which state's laws should apply to a right of publicity claim under Tennessee choice of law principles, where the alleged violation occurred in multiple jurisdictions. However, applying the Restatement factors, the court finds that Arizona law governs the plaintiffs' claims. Certainly, there is *some* relationship between Sam Moore's claims and Tennessee: a few days of filming took place in Tennessee, the defendants presumably published and/or marketed copies of *Soul Men*, the DVD, and the Soundtrack in Tennessee, Sam Moore initially gained fame through records he made in Tennessee, Sam Moore has performed multiple times in Tennessee and has some fans here; the Moores maintained some form of "residence" in Tennessee through 2000; and Joyce Moore claims to have incorporated a business in Tennessee that apparently was dissolved by 2002.

Notwithstanding these connections, the facts of the case strongly favor the application of Arizona law under the Restatement's "most significant relationship" test. None of the parties to this case are current residents of Tennessee or maintain a principal place of business in Tennessee;[30] the vast majority of filming of *Soul Men* (36 days out of 40) took place outside of Tennessee; the Moores have maintained a domicile in Arizona for nearly 25 years; Joyce Moore manages Sam Moore's business affairs out of Arizona; and the plaintiffs allegedly receive income and royalty statements in Arizona. The fact that some alleged infringing activity may

---

[30]The Response suggests that Sam Moore maintains a "primary place of business in Tennessee." (Pltfs. SJ Resp. at p. 10.) This representation, made by counsel for the first time at the summary judgment stage, is not otherwise supported by the record.

have occurred in Tennessee is not persuasive, because the alleged infringing activity would have occurred in all other states (*i.e.*, including Arizona), as well.

Furthermore, several alleged links between the plaintiffs' claims and Tennessee are largely immaterial and unpersuasive as to choice of law. The fact that the plaintiffs occasionally receive forwarded mail in Arizona that was originally addressed to a Nashville address does not outweigh the fact that the plaintiffs have largely run Sam Moore's business operations out of their Arizona domicile for 25 years and were doing so when the alleged infringing activity occurred. Similarly, the fact that Joyce Moore simply retained her "615" cell phone number after she moved to Arizona does not somehow establish that the claims in this matter more significantly relate to Tennessee because she may have made or received calls at that phone number. Furthermore, the court is unpersuaded by the plaintiffs' argument that it would be "manifestly unjust" and " undesirable and inefficient" for this court to apply Arizona law. (*Id.* at p. 13.) To the contrary, the court finds that (1) the Restatement approach to the right of publicity claim is relatively straightforward to apply, and (2) it is not unjust to apply Arizona law to claims by two longtime Arizona residents who have operated the relevant business affairs largely out of Arizona.

The defendants have requested leave to brief the right of publicity claim, should the court choose to reach its merits. Nevertheless, the defendants' briefing contains arguments (albeit largely in footnotes) that the right of publicity should fail, even if Arizona law applies. Also, as the plaintiffs point out, nothing prevented the defendants from presented these as "in the alternative"-type arguments. At any rate, because the court finds that summary judgment in defendants' favor is warranted, further briefing by the defendants is not necessary.

(2)     TCPA and TTMA Claims

With respect to the TCPA and TTMA claims, the plaintiffs simply contend that their choice of law argument relative to the right of publicity claim "applies equally" to the TCPA and TTMA claims. The court has already rejected those arguments and found that Arizona law applies to the right of publicity claims. Therefore, the court finds that Arizona law applies to the TCPA and TTMA claims.

Unlike the right of publicity claim, the plaintiffs have not identified any Arizona equivalent to the TCPA or TTMA claims, nor have they requested leave to amend their claims or supplement their briefing should the court find – as it has – that Tennessee law is inapplicable to these claims. Therefore, the court will summarily dismiss the TCPA and TTMA claims with prejudice.[31]

(3)     Conspiracy Claim

Arizona and Tennessee recognize substantially similar claims for civil conspiracy, except with the respect to the burden of proof: Arizona requires a plaintiff to prove a conspiracy by "clear and convincing evidence," while Tennessee only requires a plaintiff to prove a conspiracy by a "preponderance of the evidence." *Compare Wells Fargo Bank v. Ariz. Laborers, Teamsters and Cement Masons Local No. 395 Pension Fund*, 38 P. 3d 12, 37 n.25 (Ariz. 2002) (clear and convincing evidence) *with Stanfill v. Hardney*, No. M2004-02768-COA-R3-CV, 2007 WL

_____

[31]Sam Moore's TTMA claim largely runs with the § 43(a) Lanham Act claim, on which the court finds that summary judgment is warranted, in any case. Also, the court notes that the plaintiffs vehemently opposed the defendants' request to submit a supplemental brief with additional legal authority as "mere gamesmanship," because "arguing in the alternative is standard practice for attorneys." (Pltfs. SJ Resp. at p. 16.) As noted in this section, the point is well-taken and applies with equal force to the plaintiffs, who have similarly failed to present any alternative argument regarding the TCPA and TTMA claims.

2827498, at *8 (Tenn. Ct. App. Sept. 27, 2007) (preponderance of the evidence).

Although the competing evidentiary standards present a potential conflict of law, the court does not need to decide the issue because, as described further below, the claim plainly fails, regardless of which evidentiary burden applies.

## IV.    <u>Statute of Limitations</u>

In the court's opinion concerning the Motion to Dismiss, the court rejected the defendants' argument that some of the plaintiffs' claims are barred by Tennessee's one-year statute of limitations.  (*See* Docket No. 112 at pp. 16-17.)  The court held that, based on the sound logic of *Miller v. Miramax Film Corp.*, Case No. CV 99-08526 DDP (AJWx), 2001 U.S. Dist. LEXIS 25967, at *39 (C.D. Cal. Sept. 26, 2001), the statute of limitations did not begin to run until the *Soul Men* movie was released in its final form in late 2008.

The defendants now cite to evidence that the plaintiffs became aware of the content and working title of the Movie by October 2007 and that the plaintiffs began complaining about *Soul Men* well before the Movie was released, including a March 2008 letter from Sam Moore's counsel regarding potential infringement claims.  At the Motion to Dismiss stage, the court already considered the defendants' arguments concerning the March 2008 letter, and held that, "given the nature of claims and the industry at issue, the most reasonable time to conclude that the claims accrued is when the Movie was released."  (Docket No. 112 at pp. 16-17.) Notwithstanding the additional facts cited by the defendants here, the court finds no reason to reconsider its previous holding.  Accordingly, the court finds that none of Sam Moore's remaining claims are barred by Tennessee's statute of limitations.

### <u>MERITS ANALYSIS OF REMAINING CLAIMS BY SAM MOORE</u>

Having determined that summary judgment will be granted as to all claims by Joyce Moore, all claims by The SJM Trust, and Sam Moore's TCPA and TTMA claims, the court will analyze the remaining claims asserted by Sam Moore on their merits. These include the following claims: (1) unfair competition/false designation of origin under § 43(a) of the Lanham Act; (2) trademark dilution under § 43(c) the Lanham Act; (3) common law unfair competition (under Tennessee law); (4) violation of Sam Moore's right of publicity (under Arizona law); (5) false light invasion of privacy (under Arizona law); and (6) civil conspiracy.

## I.    Lanham Act Claims and Unfair Competition Claim

The plaintiffs allege a claim for unfair competition under the Lanham Act, a claim for dilution under the Lanham Act, and a common law unfair competition claim.

### A.    Lanham Act Unfair Competition Claim

####    (1)    Legal Standard

Under § 43(a) of the Lanham Act:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which --
>
> > (A)    is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person
> >
> > . . .
>
> shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a) (2012). The essential elements of a false designation of origin claim under

15 U.S.C. § 1125(a) are as follows:

(1)    Ownership of a specific mark;

(2)    Continuous use of the mark;

(3)    Establishment of a secondary meaning if the mark is descriptive;

(4)    A likelihood of confusion amongst consumers due to the contemporaneous use of the parties' marks in connection with the parties' respective services.

*Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 355 (6th Cir. 1998).

Furthermore, where the title of a work is expressive, the First Amendment is implicated and the court must apply the so-called *Rogers* test, which holds that, unless the use of the mark "has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, . . . unless [the use] explicitly misleads as to the source of the content of the work," the use is protected.  *Parks v. LaFace Records*, 329 F.3d 437, 451-52 (6th Cir. 2003) (citing *Rogers v. Grimaldi*, 875 F.2d 994, 999 (6th Cir. 1989)); *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 924-28 (6th Cir. 2003).  Under that standard, absent an "explicit indication [of misleading] on the face of" the relevant materials, the interests of artistic expression "preclude application of the [Lanham] Act."  *ETW*, 332 F.3d at 937.

(2)    <u>Marks and Titles Potentially at Issue</u>

As this court previously stated in its Memorandum concerning the Motion to Dismiss, the plaintiffs' § 43(a) Lanham Act cause of action implicates two sets of potential claims: those related to the Marks and those related to the Titles.

(a)    The First Amendment Plainly Bars the Plaintiffs' § 43(a) Claims Relative to the Marks.

With respect to the Marks, the court has already stated as follows:

> Absent the argument about 'competing titles,' the court might be inclined to dismiss Count III [the Lanham Act § 43(a) claim]. It appears very unlikely, and, perhaps, 'facially implausible,' that the defendants' use of the term 'Soul Men' is not artistically relevant or that it 'explicitly misleads' the consumer as to the source of the mark. It appears from the Complaint and related materials that there is no allegation that any of the materials makes explicit reference to Mr. Moore, and, therefore, satisfying the high bar set by *Rogers* would be very difficult.

(Docket No. 112 at p. 21.) Notwithstanding these observations, Sam Moore continues to argue that he has a viable § 43(a) claim relative to the Marks, contending that the record evidence indicates that the defendants explicitly misled the public about the source and content of *Soul Man*. However, as Moore apparently concedes, the title of the movie "*Soul Men*" is of artistic relevance to the Movie – which is about two male soul singers – thereby implicating First Amendment protections and the associated *Rogers* test. *See Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1379 (2nd Cir. 1993).

Sam Moore has not cited to any evidence that justifies a different conclusion than the court suggested at the Motion to Dismiss stage. Sam Moore has not cited to any evidence from which a reasonable factfinder could conclude that any materials related to the movie *Soul Men* contained explicitly misleading statements about the content and source of the Movie. For instance, the Movie and Soundtrack titles do not explicitly reference Sam Moore or Sam & Dave, neither Sam Moore nor Sam & Dave are mentioned in the script, and the plaintiffs have not cited to any marketing or promotional materials that incorporate explicit references to Sam & Dave or Sam Moore.

To the contrary, the Movie's DVD and Soundtrack covers contain clear attributions of the sources of the materials contained therein. For example, the left-hand corner of the DVD contains the logos for "Dimension Home Entertainment" and "Genius Products," and a passage

above that states as follows: "*Soul Men* © 2008 The Weinstein Company LLC.  All rights reserved.  Artwork © 2009 The Weinstein Company.  All rights reserved.  Designed, manufactured, and distributed by Genius Products, LLC."  Similarly, the Soundtrack contains text stating as follows: "This compilation ℗ & © 2008 Concord Music Group, Inc., 100 N. Crescent Drive, Beverly Hills, CA 90210.  All rights reserved . . . Motion Picture Artwork and Photos © 2008 The Weinstein Company.  All rights reserved."

Although there are some broad stock similarities between the *Soul Men* lead characters' musical styles and fashion styles to those utilized, at times, by Sam & Dave and/or Sam Moore, the existence of those broad similarities – particularly in light of the clear and accurate attributions of the actual sources – does not even approach establishing that the Movie and the Soundtrack are *explicitly misleading* as to their content.

Therefore, regardless of whether Sam Moore could otherwise meet the elements of a § 43(a) claim with respect to the Marks – an issue that the court need not reach – that claim is plainly barred by the First Amendment.

(b)    Competing Titles

In *Rogers*, the court noted that the test articulated therein did not apply to "misleading titles that are confusingly similar to other titles."  *Rogers*, 875 F.2d at 999 n.5.  Under those circumstances, the basic "likelihood of confusion" test applies.

Sam Moore has claimed that, by titling the movie *"Soul Men,"* the defendants confusingly titled their work with regards to the plaintiffs' 1967 album *"Sam & Dave Soul Men"* and the 2008 DVD *"The Original Soul Men."*  At the Motion to Dismiss stage, the court found that this competing titles claim was not facially implausible and, on that basis, refused to dismiss

67

the § 43(a) claim. (Docket No. 112 at p. 21.)

However, the court noted that the competing titles claim likely did not apply to Concord (*id.*), because the title of the Soundtrack, *Soul Men Original Motion Picture Soundtrack* – is not misleading or confusingly similar to the titles of the Historic Films DVD or the Atlantic Records Album. *See Sullivan v. CBS Corp.*, 385 F.3d 772, 778 (7th Cir. 2004). Because the defendants at the time had not attempted to differentiate the claim against Concord, the court suggested that Concord should address the issue at summary judgment. The defendants have now done so (*see* Docket No. 306 at p. 31, n.38), and the plaintiffs have not addressed the defendants' argument that Concord is not subject to the competing titles claim under any circumstances. Accordingly, summary judgment in favor of Concord on this claim is plainly warranted without further analysis.

As to the competing titles claim against TWC, MGM, and Genius Products, the defendants argue that the plaintiffs cannot satisfy the *Rogers* test. However, as the court has previously stated and as noted in *Rogers* itself, the *Rogers* test does not apply to competing titles claims. Therefore, the First Amendment does not bar the § 43(a) Lanham Act competing titles claim, which the court will analyze on its merits with respect to TWC, MGM, and Genius Products.

(3)    Lanham Act Competing Titles Claim

The defendants assert that Sam Moore has failed to produce evidence supporting a § 43(a) competing titles claim.

a.    Lack of a Cognizable Interest

"It is axiomatic that in order to seek the protections of trademark law, one must have a

68

protectable trademark." *G.M.L., Inc. v. Mayhew*, 188 F. Supp. 2d 891, 895 (M.D. Tenn. 2002).

As the Supreme Court stated in *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767-68

(1992) (citations and internal quotation marks omitted):

> The Lanham Act was intended to make 'actionable the deceptive and misleading use of marks' and 'to protect persons engaged in . . . commerce against unfair competition.' § 45, 15 U.S.C. § 1127.  Section 43(a) prohibits a broader range of practices than does § 32, which applies to registered marks, but it is common ground that § 43(a) protects qualifying unregistered trademarks and that the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a).

Thus, a trademark need not be registered in order to be protected, as long as it is capable of

registration under § 2.  However, "[a] plaintiff claiming unfair competition under § 43(a) must

show that it owns a valid trademark eligible for protection." *G.M.L.*, 118 F. Supp. 2d at 895..[32]

Here, the "marks" at issue are unregistered.  Thus, Sam Moore must show that he

possesses common law trademark rights, which are shown through actual and prior use in

commerce – *i.e.*, use and display of a mark in the ordinary course of trade.  15 U.S.C. §§ 1125,

---

[32]As the Sixth Circuit has stated:

> A trademark is a designation . . . which serves to identify and distinguish [the] goods [of the mark's owner] . . . from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.  15 U.S.C. § 1127.  Although some marks are classified as inherently distinctive and therefore capable of protection, it is not the case that all inherently distinctive symbols or words on a product function as trademarks.  Rather, in order to be protected as a valid trademark, a designation must create a separate and distinct commercial impression, which performs the trademark function of identifying the source of the merchandise to the customers.

*G.M.L.*, 188 F. Supp. 2d at 895 (citing *Rock & Roll Hall of Fame & Museum v. Gentile Prods*, 134 F.3d 749, 753 (6th Cir. 1998)) (internal citations and quotation marks omitted, alterations in original).

1127; *Allard*, 146 F.3d at 356 ("[T]rademark or service mark ownership is not acquired by federal or state registration. Rather, ownership rights flow only from prior appropriation and actual use in the market."); *WSM, Inc. v. Wheeler Media Servs., Inc.*, 810 F.2d 113, 117 (6th Cir. 1987).

The defendants argue that Sam Moore lacks standing to bring a § 43(a) claim, arguing, in part, that he has not produced evidence that he has a protectable ownership interest in the Titles. (*See* Defs. SJ Mem. at pp. 18-19.) Although the Plaintiffs in their Response extensively discuss whether Sam Moore has a proprietary interest in the term "Soul Men" and variations thereof generally, the plaintiffs do not actually address the defendants' argument that the plaintiffs have no ownership interest in the Titles. The plaintiffs simply state, without citation to the record or to any legal authority, that "Plaintiffs also claim rights in and to the titles of the 2008 DVD '*The Original Soul Men*' and [the] 1967 recording album '*Soul Men*'."[33] (*See* Pltfs. SJ Resp. at p. 16.) In the absence of any citation to record evidence or legal authority establishing that Sam Moore (or the other plaintiffs) have any cognizable interests to assert relative to the competing Titles, the court finds that summary judgment on the competing titles claim is warranted on that basis alone.

b.      No Likelihood of Confusion

----

[33]Indeed, Atlantic Records has all rights in the "Sam & Dave" masters and plaintiffs do not control how the Atlantic Records Album is currently distributed or licensed. (PRDSUF at ¶ 26.) In their PRDSUF, the plaintiffs note that they are entitled to 25% of Historic Films' gross royalties with respect to the Historic Films DVD, although it appears that the plaintiffs have never actually received any such payments. The plaintiffs in their Response simply fail to address why this prospective royalty interest in the Historic Films DVD (from which they have never derived any income) somehow entitles them to assert a trademark claim relative to that DVD.

Even assuming *arguendo* that Sam Moore has a cognizable interest in the Titles and that he could establish that the Marks are protectable, he has not presented evidence from which a reasonable factfinder could conclude that there is a "likelihood of confusion" between the Movie and the Soundtrack on the one hand and the Titles on the other. In determining whether there is a likelihood of confusion, courts typically consider the following eight factors: (1) the strength of the senior mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent in selecting the Mark; and (8) likelihood of expansion of the product line. *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, – F.3d – , Case Nos. 10-5508, 10-5586, 10-5819, 2012 WL 1605755, at \*5 (6th Cir. 2012) (citing *Frisch Rests., Inc. v. Elby's Big Boy, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982)).

<u>*Strength of the alleged Marks*</u>: To evaluate the strength factor under the *Frisch* analysis, the court "focuses on the distinctiveness of a mark and its recognition among the public." *Maker's Mark*, 2012 WL 16057655, at \*6 (quoting *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 631 (6th Cir. 2002)). "A mark is strong if it is highly distinctive, *i.e.*, if the public readily accepts it as the hallmark of a particular source; it can become so because it is unique, because it has been the subject of wide and intensive advertisement, or because of a combination of both." *Id.* (citing *Homeowners Grp. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991)). The mark must also demonstrate a high level of recognition among the consuming public. *See, e.g., id.* (finding that inherently distinctive red wax drip on Maker's Mark bottles constituted a strong mark, where mark was registered and incontestable, had been used for over fifty years, was the subject of extensive advertising revenue "focused almost

71

entirely on branding the red dripping wax", and evidence reflected broad consumer recognition among both whiskey drinkers and distilled spirits drinkers more generally).  Also, extensive third-party uses of a trademark may substantially weaken the strength of a mark.  *Id.* at \*7 (citing *Homeowners Grp.*, 931 F.2d at 1108)).

Here, the Marks (assuming they even qualify as trademarks) are extremely weak.  Particularly as concerns the terms "Soul Man", they are descriptive, unregistered, and not particularly distinctive.  The defendants have adduced many instances in which other entertainers, movies, and publications have utilized the term "Soul Man" or "Soul Men," including references to various other soul music artists, weakening the distinctiveness of these terms and the likelihood that they serve as the "hallmark" of a distinct source – *i.e.*, Sam Moore.  *See Homeowners Grp.*, 931 F.2d at 1107; *see also Kebab Gyros, Inc.*, No. 3:09-0061, 2011 WL 1522343, at \*8 (M.D. Tenn. Apr. 19, 2011).  Moreover, there is scant evidence that Sam Moore has spent significant sums advertising his Marks, he has never made a demand on any third-party concerning the Marks before this lawsuit, and, aside from the concert riders requiring that he be billed as the "Sam Moore 'The Legendary Soul Man'" or some variation thereof, there is no evidence that he has ever granted a trademark license for the Marks.  At most, the Marks would be entitled to a minimal level of protection.  *Cf. Maker's Mark*, 2012 WL 1605755, at \*7 (noting that *Business Week* had identified the Maker's Mark red wax dripping seal as "one of the most recognizable branding symbols in the world.")

*Similarity of the Marks*:  In assessing the similarity of the marks, the court does not conduct a "strict, side-by-side analysis of the two marks."  *Therma-Scan*, 295 F.2d at 633.  Rather, the court is to consider how a consumer would view the allegedly infringing mark alone,

with the understanding that the consumer will have some, potentially vague, impression or recollection of the senior mark. *See Kebab Gyros. Inc. v. Riyadh*, Case No. 3:09-0061, 2011 WL 1522343, at *9 (M.D. Tenn. Apr. 19, 2011). "[T]he relevant inquiry is whether a particular trademark, when viewed alone, would lead to uncertainty about the goods or services that it identifies." *Therma-Scan*, 295 F.3d at 633.

Here, there are several relevant distinctions between the Marks and the Titles. First, the term "Soul Man" is singular, while the term "Soul Men" is plural.[34] Second, the typefaces on the Movie, Soundtrack, and competing Titles are all distinct. Thus, there is no indication that the Movie or Soundtrack producers sought to mimic (or would create confusion with respect to) some particular visual means of presenting the alleged Marks, because there does not appear to be such a distinctive presentation of the alleged Marks by Sam Moore in the first place. *See Kebab Gyros*, 2011 WL 1522343, at *9 ("[T]he relevance of the similarity between "KEBAB GYROS" and 'KABAB GYROS' is reduced by the fact that there is no identifiable styling or layout in which 'KEBAB GYROS' is usually displayed. Certainly, if 'KEBAB GYROS' were always displayed in (for example) blue lettering with a unique bold font on a white background

---

[34]In support of their contention that the singular and plural forms of "Soul Man" are indistinguishable for trademark purposes, the plaintiffs cite to a 1957 decision of the United States Court of Customs & Patent Appeals, *Wilson v. Delaunay*, 245 F.2d 877, and a 1985 Trademark Trial and Appeal Board decision, *In re Pix of Am., Inc.*, 1985 TTAB LEXIS 106. In *Wilson*, the court observed that, as between a company seeking to sell "Zombie" candy and another company that had already registered a mark for "Zombies" candy, the singular and plural forms of the word presented "no material difference." *Wilson*, 44 CCPA at 1021. In *Wilson*, the board similarly noted that, as between a company seeking to register "Newports" for women's shoes and a company selling outer shirts under the "Newport" brand, the singular form of Newport was materially indistinguishable under those circumstances. Neither of these citations, whatever their persuasive weight, rebut the point that context is important in evaluating all aspects of the similarities between two marks.

and the defendant provided the same lettering and background for 'KABAB GYROS,' the similarity would be likely to cause confusion.  But . . . that is not at all the case here.")

Moreover, the Movie and Soundtrack contain no indication that they relate to Sam & Dave or Soul Men.  To the contrary, as discussed above, they explicitly reference their *actual* sources.  The *Soul Men* movie contains pictures of Jackson and Mac in character, just below the title *Soul Men,* and black typeface identifying their actual names above their characters.  The back of the Movie's DVD contains a description of the Movie that provides a brief plot synopsis, two photographs of Jackson and Mac in shiny suits (one with the female character Cleo) and a "credits" section attributing the sources of the Movie, including the actors, the production company (Dimension Films), the directors, the DVD distributor (Genius Products), *etc.* Similarly, the Soundtrack is entitled *Soul Men Original Motion Picture Soundtrack*, contains no references to Sam & Dave or Sam Moore, and contains a front panel with Jackson and Mac posing in character adjacent to a vertical Apollo-style "Soul Men" marquee and below neon-colored font containing their non-Movie character names.  The back panel of the Soundtrack simply lists the artists (none of whom are Sam Moore or Sam & Dave), the associated songs (none of which are Sam & Dave songs), and a small credits panel that, like the Movie, explicitly attributes the actual sources of the Movie and the Soundtrack (*e.g.*, Concord).

Taking these facts into consideration, the similarity factor weighs against Sam Moore and in favor of the defendants.

*Actual Confusion*:  Although "evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion," the "lack of such evidence is rarely significant, and the factor of actual confusion is weighted heavily only when there is evidence of past confusion, or

perhaps, when the particular circumstances indicate such evidence should have been available."

*Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 284 (6th Cir. 1997); *Ignition Athletic Performance Grp., LLC v. Hantz Soccer U.S.A., LLC*, 245 Fed. App'x 456, 459 (6th Cir. 2007) ("The absence of actual evidence of consumer confusion is inconsequential.").  A plaintiff must show only "a sufficient *potential* of confusion, not actual confusion . . . ."  *Daddy's Junky Music Stores*, 109 F.3d at 284 (emphasis in original).   Here, the plaintiffs have presented no evidence of actual confusion.  However, pursuant to *Daddy's Junky Music Stores*, the court will not rely on this factor.  Nevertheless, the court notes that, as a general matter, Sam Moore has not even demonstrated that there is a sufficient potential of confusion.[35]

 *Relatedness of the Goods*:  The Movie and the Historic Films DVD are both films related to soul music.  The Soundtrack and the Atlantic Records Album are both DVD's that contain soul music.  At this broad level of generality, this factor could favor Sam Moore.  However, as the defendants point out, the Atlantic Records Album and the Movie Soundtrack are just two more entrants in a crowded field of music products that bear similar or even identical titles.  Thus, the court finds this factor to be of limited weight in the context of this case.

 *Intent of the Defendants*:  "If a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity."  *Daddy's Junky Music Stores*, 109 F.3d at 286 (quoting *Homeowners Grp.*, 931 F.2d at 1111).  "Intent is relevant because purposeful copying indicates that the alleged infringer, who has at least as much

---

[35]Under Tennessee law, unfair competition claims require a showing of actual confusion. Thus, even if the claim arose under Tennessee law, the unfair competition claim would independently fail for this reason alone.

knowledge as the trier of fact regarding the likelihood of confusion, believes that his copying may divert some business from the senior user." *Daddy's Junky Music Stores*, 109 F.3d at 286 "Direct evidence of intentional copying is not necessary to prove intent. Rather, the use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying." *Id.*

Here, the defendants did not use the term "Soul Men" for trademark purposes in the first place, nor did they sell any merchandise under the mark "soul men," aside from the Movie and the Soundtrack themselves. Moreover, there is simply no evidence from which a reasonable factfinder could conclude that the defendants, in creating and marketing the Movie, its DVD, and the Soundtrack, intended to infringe on Sam Moore's alleged Marks. To the contrary, the uncontroverted evidence demonstrates that the Movie's scriptwriters, producers, director, and actors created – and subjectively believed they were creating – a work of fiction.[36] Indeed, by the time TWC acquired the script from another studio, the working title "Soul Men" had already been selected and the broad outlines of the plot had already been set. Finally, the Movie and Soundtrack contain no references to Sam & Dave/Sam Moore and explicitly contain information on their covers reflecting the *actual* sources of those products, including TWC, MGM, Genius Products, and/or Concord, as appropriate. This factor weighs strongly against the plaintiffs and in favor of defendants.

*Marketing Channels Used and Purchaser Care*: "Generally, in assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising

---

[36]Furthermore, MGM, Genius Products, and Concord were not involved in the creative process behind the Movie, in any case.

ordinary caution." *Homeowners Grp.*, 931 F.2d at 1111. Courts have found that relatively inexpensive items, such as CDs, may not implicate the degree of purchaser care associated with higher-priced items under appropriate circumstances. *See, e.g.*, *Mike Love v. Mail on Sunday*, Case No. CV-07-7798 ABC (PJWx), 2006 U.S. Dist. LEXIS 95456 (C.D. Cal. Aug. 15, 2006). However, particularly where the genres of entertainment products are distinct, the assumption is that purchasers of products such as CDs are "necessarily discriminating." *See Tsiolis v. Interscope Records, Inc.*, 946 F. Supp. 1344, 1356 (N.D. Ill 1996). Moreover, if the evidence suggests that there is a sufficient basis on which the consumer can readily distinguish the two products, the fact that the traditional consumer might not be especially careful in making his decision is afforded less weight. *Kebab Gyros*, 2011 WL 1522343, at *11 (citing *Gray v. Meijer*, 295 F.3d 641, 649 (6th Cir. 2002)).

The Atlantic Records Album and Historic Films DVD appear to be marketed in traditional online and retail music outlets, as are the Movie and Soundtrack. However, the plaintiffs are not involved in the marketing or promotion of the Titles, in which they have no ownership or copyright interest. Other than these facts, the parties have presented limited information regarding the manner and means by which the Movie/DVD, Soundtrack, and Titles have been marketed. At any rate, the Movie is a fictional feature film, while the Historic Films DVD is a documentary. The Soundtrack explicitly is a soundtrack associated with the *Soul Men* Movie, not with any other potential source. There seems to be little risk that a consumer looking for a "Sam & Dave" musical album or a "Sam & Dave" documentary would be confused, either online or at a retail music store, by the presence of the *Soul Men* movie title or the *Soul Men Original Motion Picture Soundtrack* title.

*Likelihood of Expansion of the Product Line*: "A 'strong possibility' that either party will expand his business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing." *Homeowners Grp.*, 931 F.2d at 1112. Here, the plaintiffs contend that the existence of the *Soul Man* feature film significantly reduces the possibility that Sam Moore will be successful in pitching a major motion picture about his life. The court has reviewed the citations referenced in support of this position and finds them to be unpersuasive. It appears that the plaintiffs have pitched the idea of a Sam Moore/Sam & Dave feature film to several movie studios, including TWC, but have been met with little interest. Regardless, the plaintiffs have not demonstrated that the existence/release of the film *Soul Men* has played any role in their failure to generate interest in a Sam Moore-centered "biopic." Thus, the court finds that this factor does not weigh in favor of the plaintiffs.

Taking these factors into account, the court finds that there is not sufficient evidence from which a reasonable factfinder could conclude that there is a "likelihood of confusion" between the Movie/DVD/Soundtrack on the one hand and the Titles on the other. In particular, several factors in the analysis overwhelmingly weigh against such a finding. Therefore, even if Sam Moore had a cognizable trademark interest in the Marks, the Lanham Act § 43(a) claim would fail.

### B.     Lanham Act Dilution Claim

#### 1.     Legal Standard

The Federal Trademark Dilution Act ("FTDA"), Pub. L. No. 104-98, 109 Stat. 985 (1995), amended the Lanham Act to include a claim for dilution, as follows:

> The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against

another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection.

15 U.S.C. § 1125(c)(1) (Lanham Act § 43(c)(1).)  Dilution is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties; or (2) likelihood of confusion, mistake, or deception."  15 U.S.C. § 1127.

The law governing dilution is independent from the law attendant to claims of trademark infringement.  *Autozone, Inc. v. Tandy Corp.*, 373 F.3d 786, 801 (6th Cir. 2004).  "Dilution law, unlike traditional trademark infringement law [,] is not based on a likelihood of confusion standard, but only exists to protect the quasi-property rights a holder has in maintaining the integrity and distinctiveness of his mark."  *Id.* (internal quotation omitted).  Courts recognize two principal forms of dilution: tarnishing and blurring.  *Id.*  Dilution by tarnishing occurs when a junior mark's similarity to a famous mark causes consumers mistakenly to associate the famous mark with the defendant's inferior or offensive product.  *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 466 (7th Cir. 2000) (cited in *Autozone*, 373 F.3d at 801).  Dilution by blurring occurs when consumers see the plaintiff's mark used on a plethora of different goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product.  *Autozone*, 373 F.3d at 801 (citing *Eli Lilly*, 233 F.3d at 466). The FTDA "seeks to prevent both of these forms of dilution by protecting the trademark owner from the erosion of the distinctiveness and prestige of a trademark caused by . . . a proliferation of borrowings, that while not degrading the original seller's mark, are so numerous as to deprive the mark of its distinctiveness and hence impact."  *Autozone*, 373 F.3d at 801 (quoting Pub L.

79

No. 104-98, 109 Stat. 985 (1995)) . Here, Sam Moore does not specify whether he is pursuing a theory of blurring or tarnishment.

To make out a federal dilution claim, "the senior mark must be (1) famous; and (2) distinctive. Use of the junior mark must be (3) in commerce; (4) have begun subsequent to the senior mark becoming famous; and (5) cause dilution of the distinctive quality of the senior mark." *Id.* at 802 (citing *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d at 616)).

The degree of famousness required to make out an FTDA claim is high, because the Dilution Act was meant to afford expansive trademark protections to a "far narrower" class of entities than those subject to traditional trademark protections. *See TCPIP Holding Co. v. Haar Commc'ns*, 244 F.3d 88, 94 (2d Cir. 2001). Essentially, the FTDA permits the owner of a qualified, famous mark to enjoin uses throughout commerce, regardless of the absence of competition or confusion. *Id.*; *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 875 (9th Cir. 1999) (stating that the FTDA comes "very close to granting rights in gross in a trademark"); *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 47 (1st Cir. 1998) ("[T]he standard for fame and distinctiveness required to obtain anti-dilution protection is more rigorous than that required to seek infringement protection.")

Here, the defendants challenge whether Sam Moore has any trademark interests to assert in the first place.[37] The defendants also argue that, even assuming that Sam Moore possesses trademark interests in the Marks, he has not provided sufficient evidence that the Marks are

---

[37]The defendants' argument that Sam Moore possesses no cognizable trademark interests is contained within the section of their Memorandum of Law relating to the Lanham Act § 43(a) claim. This argument and the plaintiffs' response thereto apply with equal force to alleged trademark rights supporting the Lanham Act § 43(c) claim.

"famous" for purposes of Lanham Act § 43(c).

    2.    <u>Whether Sam Moore has Trademark Interests in the Marks</u>

First, the defendants argue that Sam Moore lacks standing, contending that he has not produced evidence that he used the Marks in connection with the sale of goods or services. However, there is evidence in the record that Sam Moore often held himself out as the "Soul Man" or some variation thereof in soliciting business, including live performances and celebrity appearances. Accordingly, this is at least sufficient evidence to create a genuine dispute of material fact on this point.

Second, the defendants argue that the "Soul Man" marks are not protectable because singing a song or incorporating a title in musical performance does not create a protectable trademark. *See L.A. Triumph, Inc. v. Ciccone*, No. CV 10, 06195 SJO (JCx) 2011 WL 5562810, at *3 (C.D. Cal. Aug. 31, 2011) ("Defendants' argument that Madonna created the "Material Girl" mark through her performances fails as a matter of law. This Court and other courts have recognized that the singing of a song does not create a trademark."); *Butler v. Target Corp.*, 323 F. Supp. 2d 1052, 1059 (C.D. Cal. 2004) ("[N]o trademark or service mark in a performing artists' signature performance" may exist); *Oliveira v. Frito-Lay, Inc.*, 251 F.3d 56, 62-63 (2d Cir. 2001) ("[T]he law does not accord . . . trademark rights in the recording of . . . signature performance[s].") However, unlike the cases cited by the defendants, the performer here (Sam Moore) billed himself as the "Soul Man" (and variations thereof) and in part alleges that the defendants violated his rights by promoting a film and soundtrack with the same name. Therefore, the court finds that the cases cited by the defendants are distinguishable.

Third, the defendants argue that the terms "soul man" and "soul men" are generic with

regard to services in the field of musical entertainment generally. "The existence and extent of trademark protection for a particular term depends on that term's inherent distinctiveness. Courts have identified four general categories of terms: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful." *Bath & Body Works*, 76 F.3d at 748. As set forth in *Bath & Body Works*:

> A generic or common descriptive term is one which is commonly used as the name or description of a kind of goods. It cannot become a trademark under any circumstances. A merely descriptive term specifically describes a characteristic or ingredient of an article. . . .

> Whether a name is generic is a question of fact. . . . If a trademark is not federally registered, once the defendant raises genericness as a defense, plaintiff must prove lack of genericness.

*Id.*; *Gen. Conf. Corp. of Seventh Day Adventists v. McGill*, 617 F.3d 402, 413 (6th Cir. 2010). In making a determination about whether a mark is generic, "courts consider such evidence as dictionary definitions, competitors' use, plaintiffs' use, media usage, national testimony by people in the trade, and consumer surveys." *Borescopes*, 728 F. Supp. 2d at 947 (citations omitted) (quoting *Gaylord Entm't Co. v. Gilmore Entm't Grp., LLC*, 187 F. Supp. 2d 926, 936-37 (M.D. Tenn. 2001)).

Here, the defendants have identified numerous examples of media that utilize the phrases "soul men" or "soul man" to refer to individuals other than Sam Moore. However, unlike the alleged mark at issue in *Borescopes*, the defendants have not identified any existing or pending trademark applications for "Soul Man" and do not appear to contend that the examples in the Harvey Declaration constitute uses independently subject to trademark protection. Also, the defendants do not contend that any dictionary defines "soul man" generally. Furthermore, there is at least some evidence that the plaintiffs have billed Sam Moore's performances as

82

incorporating his persona as the "Soul Man" for several decades and that the media at times referred to Sam Moore as the "Soul Man" or to Sam & Dave as "Soul Men." Finally, based on the record, the court cannot state that, as a matter of law, the public identifies the phrase "soul man" as a generic or common description for a class of services. Thus, viewing the facts in the light most favorable to the plaintiffs, there is a question of fact as to whether the "soul man" marks are generic.

Accordingly, the court finds that there is a genuine dispute of material fact as to whether the unregistered Marks constitute trademarks under the Lanham Act.

        (3)      <u>Whether the Marks are Famous</u>

In order to qualify as "famous," a mark must be "widely recognized by the general consuming public of the United States" as a designation indicating a sole source of goods or services of the mark's owner. 15 U.S.C. § 1125(c)(2)(A). The FDTA provides as follows:

> In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:
>
> (i)      The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties;
>
> (ii)     The amount, volume, and geographic extent of sales of goods or services offered under the mark;
>
> (iii)    The extent of actual recognition of the mark;
>
> (iv)    Whether the mark was registered . . . .

*Id.* The plaintiffs do not dispute the defendants' contentions that the bar for fame is high and that it is widely recognized that a party must make much more than a showing of secondary

meaning to pursue a claim of trademark dilution.[38] *See TCPIP Holding*, 244 F.3d at 100-101

(noting that "Congress envisioned that marks would qualify as 'famous' only if they carried a

substantial degree of fame," such as "Dupont" or "Buick" or "Kodak," which are "highly

distinctive, arbitrary or fanciful marks"); *Avery*, 189 F.3d at 875 ("Dilution is a cause of action

invented and reserved for a select class of marks – those marks with such powerful consumer

associations that even non-competing uses can impinge their value."); *see also Autozone*, 373

F.3d at 802 (observing that neither party disputed that the "Autozone" registered trademark was

"famous" for purposes of FTDA); *Jimdi, Inc. v. Twin Bay Docks & Prods, Inc.*, 501 F. Supp. 2d

993, 1009 (W.D. Mich. 2007) (finding that, where plaintiff had failed to demonstrate that its

design had secondary meaning, resolution of the dilution claim against the plaintiff was

"straightforward").

     Here, the defendants argue that Sam Moore has not demonstrated that the Marks are

famous.  They argue that Sam Moore has not presented evidence of actual consumer recognition

of the "Soul Man" Marks; made no financial investment in advertising and promoting the Marks;

and did not receive any income for or related to the Marks.  They also argue that the Marks did

not even acquire secondary meaning, because, *inter alia*, the Marks are weak because they are

descriptive, the plaintiffs have not presented any direct consumer testimony or consumer

surveys, the plaintiffs never licensed any third-party uses of "soul man" or "soul men," and there

is no evidence that the defendants intended to infringe on the Marks.  (*See, e.g.*, Defs SJ Mem. at

p. 20); *Tenneco Auto. Operating Co., Inc. v. Kingdom Auto Parts*, 410 Fed. App'x 841, 846 (6th

---

[38]The plaintiffs do not cite to any case law authority concerning their federal dilution
claim.

Cir. 2010) (articulating factors relevant to secondary meaning inquiry).[39]

In response, the plaintiffs do not cite to any case law, nor do they attempt to apply any of the famousness factors identified in Lanham Act § 43(c)(2). Instead, the plaintiffs cite to exhibits containing: (1) third-party references to Sam Moore as the "Soul Man" or some variation thereof, including flyers and news articles (Ex. 3 to the PRDSUF); (2) Sam Moore's abandoned federal trademark application file; (3) the Simson and Benjaminson Reports; (4) the deposition transcript of Friedman (without citation to any particular passage within the 50+ excerpted transcript pages); (5) the Chasser Declaration (without citation to any specific pages therein); (6) a youtube.com video in which Sam Moore was introduced as "The Original Soul Man" at the 25th anniversary of the Rock & Roll Hall of Fame Concert; and (7) a youtube.com video of Sam Moore performing with Akiko Wada at The Apollo.[40]

Applying the factors enumerated in § 43(c)(2), the court finds that there is insufficient evidence from which a reasonable finder of fact could conclude that the alleged Marks are widely recognized by the general public as a designation indicating a single source of goods or services. Three of the four factors listed in § 43(c)(2) strongly weigh against a finding of famousness: Sam Moore has not received income related to the Marks, Sam Moore has presented scant evidence regarding the degree of actual recognition of the Marks by the consuming public

---

[39]The defendants point out that, at deposition, Sam Moore admitted that the Marks are not "famous." Nevertheless, the court will not rely on this statement, because Sam Moore's deposition statement cannot fairly be construed as a legal conclusion regarding the fame of plaintiffs' Marks for Lanham Act purposes.

[40]The plaintiffs also reference PRDSUF ¶ 27, which contains largely unsupported statements regarding "the enormous popularity of the song Soul Man and the album Sam & Dave Soul Men," that, at any rate, merely refers back to Exhibit 3 to the PRDSUF.

– nor has he explained why the scattered references to him as the "Soul Man" in news articles, concert flyers, and concert appearances would reflect such recognition – and the Marks are unregistered. As to the last factor, it appears that third parties have referred to and/or promoted Sam Moore as the "Soul Man" both domestically and internationally, although Sam Moore and the other plaintiffs have not personally spent any money advertising the Marks.[41] Thus, this last factor is, at best, neutral.

Moreover, much of the evidence Sam Moore cites has either been excluded, is ambiguous as to its import, or otherwise does not support his position. The court has excluded the Simson and Benjaminson Reports, the plaintiffs do not identify any portion of the Friedman deposition transcript that supports the famousness of the Marks (nor is it clear to the court how Friedman's testimony could establish this point, in any case), and the Chasser Declaration contains no opinions regarding the degree of famousness of the Mark.[42] Also, of the handful of promotional materials produced by Sam Moore over which he did not exercise control at the time they were issued, some do not reference him as the Soul Man at all, such as the AMEE awards promotional materials, while others reference Sam & Dave as "Double Dynamite," not the "Soul Men." If, for instance, the term "Soul Man" were so indelibly and exclusively associated with Sam Moore, one would expect the AMEE awards to have made explicit mention of it. Furthermore, the plaintiffs in their Response do not cite to any case law authority and do not even purport to apply

---

[41]As the defendants point out, Sam Moore improperly appears to conflate his personal fame with the "famousness" requirement for a § 43(c)(2) claim.

[42]Even if Chasser were prepared to offer opinion testimony regarding the degree of famousness, an issue on which plaintiffs bear the burden of proof, the court would exclude that testimony for violating the October 7, 2011 case-in-chief expert deadline.

the factors listed in § 43(c)(2).

Thus, even if Sam Moore could demonstrate that he has protectable trademark interests in the Marks, the record does not contain evidence from which a reasonable factfinder could conclude that he has satisfied the substantially high burden of "famousness" required for the far-reaching protections of the FTDA. Under these circumstances, the court finds that summary judgment is appropriate on Sam Moore's dilution claim.

### C. Unfair Competition Claim

To establish a claim for unfair competition under Tennessee law, a plaintiff must provide that: (1) the defendant engaged in conduct that "passed off" its organization or services as that of the plaintiff; (2) in engaging in such conduct, the defendant acted with intent to deceive the public as to the source or services offered or authority of its organization; and (3) the public was actually confused or deceived as to the source of the services offered or authority of its organization. *Sovereign Order of St. John of Jerusalem, Inc. v. Grady*, 119 F.3d 1236 (6th Cir. 1997). Tennessee's law of unfair competition differs from the federal law of unfair competition (*i.e.*, the Lanham Act § 43(a)) only in that Tennessee law requires a showing of "actual confusion," whereas the latter requires only a showing of a "likelihood of confusion." *Id.*

Here, Sam Moore's Tennessee unfair competition claim fails for the same reasons as his Lanham Act claim. Furthermore, he has not presented evidence of actual confusion, as required by Tennessee law, which alone supports dismissal. Regardless, Sam Moore has not presented evidence from which a reasonable factfinder could conclude that the defendants (individually or collectively) intended to "pass off" the Movie or the Soundtrack as endorsed by or specifically concerning Sam Moore/Sam & Dave, that the defendants acted with an intent to deceive the

public, and/or that the public was actually confused about the nature and source of the Movie and the Soundtrack.

## IV.    False Light Invasion of Privacy Claim

### A.    Legal Standard

The parties agree that the Restatement approach, which both Tennessee and Arizona have adopted, applies here.  Under that approach:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Restatement (Second) of Torts § 625E (1977); *see also West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640 (Tenn. 2001) (adopting Restatement definition); *Godbehere v. Phoenix Newspapers, Inc.*, 783 P.2d 781, 788 (Ariz. 1989) (same).

Where a false light claim is brought by a public figure, the constitutional "actual malice" standard articulated in *New York Times v. Sullivan* applies.  *See, e.g.*, *Milligan v. United States*, 644 F. Supp. 2d 1020, 1038-39 (M.D. Tenn. 2009) (citing *West*, 53 S.W.3d at 647-48); *Bindrim v. Mitchell*, 155 Cal. Rptr. 29, 92 Cal. App. 3d at 71-72 (Cal. Ct. App. 1979); *New York Times Co.*, 376 U.S. at 279-280.

### B.    Application

Sam Moore argues that the *Soul Men* movie actually portrays him, does so in a manner that is highly offensive to a reasonable person, and that the defendants acted with actual malice.

As an initial matter, Sam Moore does not make any arguments relative to the Soundtrack. As the defendants point out, it is unclear how the Soundtrack, which explicitly states that it is the

*Soul Men Original Motion Picture Soundtrack* and contains no recordings by Sam & Dave, relates to the false light invasion of privacy claim. As the plaintiffs have implicitly acknowledged through their silence on the issue, summary judgment is plainly appropriate on the false light invasion of privacy claim as relates to the Soundtrack.

Similarly, Concord had no involvement in the *Soul Men* movie – either in its production or distribution. Therefore, Concord is entitled to summary judgment on the false light claim without further analysis.

As to the claim against TWC, MGM, and Genius Products relative to the Movie, none of the Movie's producers, scriptwriters, actors, or anyone else associated with the origins, production, or distribution of *Soul Men* has testified that they intended the Movie to portray Sam Moore or Sam & Dave. Moreover, as the court has noted, there are various patent differences between the characters and plotline of the Movie and the lives of Sam Moore/Sam & Dave. The Movie is simply a fictional homage to a bygone era of R&B music that does not purport to portray Sam Moore or Sam & Dave, does not reference Sam Moore or Sam & Dave in the script, and contains no images of Sam Moore or Sam & Dave. The various stock elements of a road trip movie – accidents, run-ins with the law, encounters with members of the opposite sex, etc. – cannot reasonably be interpreted as reflecting or purporting to reflect Sam Moore's life.

Similarly, stock elements of an entertainment picture concerning a musical group – such as an internal feud followed by ultimate reconciliation – cannot reasonably be interpreted as intending to portray Sam & Dave specifically. Furthermore, the Movie contains songs by various musical artists other than Sam & Dave, it contains no Sam & Dave recordings, and the only element relating to a Sam & Dave song is the performance by Jackson and Mac of "Hold

On' I'm Comin'" early in the film. Courts have rejected libel and false light claims under circumstances even less compelling than those presented here. *See, e.g.*, *Tamkin v. CBS Broadcasting, Inc.*, 122 Cal. Rptr. 3d 264 (Cal. Ct. App. 2011); *Polydoros v. Twentieth Century Fox Film Corp.*, 79 Cal. Rptr. 2d 207 (Cal. Ct. App. 1997); *Aguilar v. Universal Studios, Inc.*, 174 Cal. App. 3d 384, 387 (Cal. Ct. App. 1985); *Sarver v. The Hurt Locker, LLC*, No. 2:10-cv-09034-JHN-JC, pp. 17-19 (C.D. Cal. Oct. 30, 2011) [attached at Ex. 1 to Docket No. 309]. Based on these facts, the court finds that there is simply no basis from which a reasonable jury could conclude that *Soul Men* "concerns" Sam Moore for purposes of a false light claim. Thus, the false light invasion of privacy claim must fail on that basis alone.

Even assuming *arguendo* that Sam Moore could satisfy the elements of a false light invasion of privacy claim, he has not produced evidence of actual malice by the defendants with respect to the Movie. Under the actual malice standard, which Sam Moore concedes applies to his claim, he must show that the defendants published the allegedly false portrayal with knowledge that it was false or with reckless disregard for whether or not it was false. *New York Times Co.*, 376 U.S. at 279-280; *Milligan*, 644 F. Supp. 2d at 1036, 1038-39; *Bindrim*, 92 Cal. App. 3d at 72. "The cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Bindrim*, 92 Cal. App. at 72 (citing *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S. Ct. 1323, 20 L. Ed. 2d 262 (1968)). The plaintiff bears the burden of showing actual malice by clear and convincing evidence. *Milligan*, 644 F. Supp. 2d at 1036 (citing *Lewis v. NewsChannel 5 Network, L.P.*, 28 S.W.3d 270, 293 (Tenn. Ct. App. 2007)). The

determination as to whether the plaintiff has established clear and convincing evidence of actual malice is a question of law that is "particularly well-suited for resolution at the summary judgment stage." *Id.* (citing *Lewis*, 238 S.W.3d at 283).

Here, there is simply no evidence from which a reasonable factfinder could find that, by clear and convincing evidence, the defendants acted with actual malice. Although the evidence indicates that the Movie's scriptwriters and producers were generally aware of Sam & Dave and their history, that the producers incorporated a cover version of "Hold On I'm Comin'" in the Movie and considered utilizing another Sam & Dave song, and that a friend of Sam Moore's and Sam Moore's counsel separately wrote to TWC to inform them of Sam Moore's belief that publication of the Movie might (in his opinion) violate Sam Moore's rights, none of this evidence suggests that the defendants actually entertained serious doubts about the "truthfulness" of the *Soul Men* movie. Indeed, none of the individuals involved in writing, producing, or performing in the Movie – including various third-party witnesses – have testified that they ever meant for the Movie to concern Sam & Dave in the first place, let alone that they intended to portray a "truthful" account of Sam Moore's life or the history of Sam & Dave. The fact that the plaintiffs wrote to the defendants to express their subjective concerns – which were plainly unfounded – is not sufficient to establish actual malice. *See, e.g.*, *Worrell-Payne v. Gannett Co.*, No. 01-35112, 2002 WL 31246121, at *2 (9th Cir. Oct. 7, 2002); *Contemporary Mission, Inc. v. New York Times*, 842 F.2d 612, 624 (2d Cir. 1988).

Thus, having examined the record in detail, the court finds that, even if *Soul Men* were about Sam Moore or Sam & Dave – which it is not – the evidence presented does not even approach the quantum of evidence required to demonstrate actual malice by clear and convincing

evidence.

## V.     <u>Right of Publicity</u>

Courts applying Arizona law to the types of claims at issue here have adopted the Restatement approach. *See Pooley*, 89 F. Supp. 2d at 1112; *Lemon*, 437 F. Supp. 2d at 1100; *Roth*, 2006 WL 988118, at *3-*4.  Under that approach, to establish a claim for invasion of the right of publicity, a plaintiff must show (1) the defendants' use of the plaintiff's identity; (2) the appropriation of the plaintiff's name or likeness to the defendant's advantage, commercial or otherwise; (3) lack of consent; and (4) resulting injury. *Id.*

Here, the defendants argue that Sam Moore has failed to show that the defendants utilized his name, photograph, or likeness – or that any viewers could reasonably have understood *Soul Men* to concern Sam & Dave.  The defendants do not challenge any of the other elements of Sam Moore's right of publicity claim.

As described in detail *supra*, the court finds that the plaintiffs have not met either of the first two elements of a right of publicity claim under the Restatement approach.  The Movie does not reference Sam Moore or Sam & Dave.  The Movie does not contain any likeness or image of Sam & Dave.  Thus, a reasonable factfinder could not conclude that the defendants used Sam Moore's identity and appropriated it to their advantage.  By contrast, the circumstances in *Lemon*, *Roth* and *Pooley* involved clear appropriation of the plaintiffs' identities, whether through apparel bearing their name or video footage of them.  For example, in *Roth*, the plaintiff doctor had appeared on the defendant's "televent" to discuss arthritis research.  2006 WL 988118, at *4.  However, without the plaintiff's knowledge, the defendant taped the interview with a product endorsement overlain on the bottom corner of the television screen and removed

the interview from the telecast. The defendant then placed the interview with the product endorsement on the defendant's commercial websites, essentially giving the false impression that the plaintiff doctor was endorsing the product in the corner of the screen. *See also Lemon*, 437 F. Supp. 2d at 1100 (identity/appropriation elements not at issue, where owners of Harlem Globetrotters had licensed apparel bearing names and numbers of plaintiff Harlem Globetrotter players); *Pooley*, 89 F. Supp. 2d at 1110-1113 (finding that plaintiff had adequately pleaded right of publicity claim, where plaintiff golf professional alleged that the defendant golf product company utilized, without consent, a video of plaintiff making a hole-in-one to promote "Million Dollar Hole-in-One" fundraising event).[43]

## VI.  <u>Unjust Enrichment</u>

The theory of unjust enrichment is a quasi-contractual theory under which a court may impose and enforce a contract implied in law. *See Freeman Industries, LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005). To make out a claim for unjust enrichment, a plaintiff must show: (1) a benefit conferred by the plaintiff on the defendant; (2) defendant's appreciation of the benefit; and (3) acceptance of the benefit under such circumstances that it would be inequitable for the defendant to retain the benefit without payment of the value of the benefit. *PHG Techs., LLC v. St. John Cos.*, 459 F. Supp. 2d 640, 646 (M.D. Tenn. 2006) (citing *Freeman*, 172 S.W.3d at 525). "The most significant requirement of an unjust enrichment claim is that the benefit to the defendant be unjust." *Id.* "The underlying principle of the doctrine of

---

[43]Even if Tennessee law governed this claim, the result would be the same. The plaintiffs have not provided evidence from which a reasonable factfinder could conclude that the defendants, individually or collectively, "knowingly use[d] or infringe[d] upon Sam Moore's name, photograph, or likeness." *See* Tenn. Code Ann. § 47-25-1105(a).

unjust enrichment is that a party who receives a benefit that he or she desires, under circumstances rendering retention of the benefit without providing compensation inequitable, must compensate the provider of the benefit." *Freeman*, 172 S.W.3d at 525.

Here, the unjust enrichment claim fails for several independent reasons. First, the Movie was not about Sam Moore, so it is unclear what "benefit" Sam Moore could have contributed to the Movie in the first place. Second, it is unclear why a quasi-contractual theory would even apply to the circumstances of this case. Indeed, in the Response section relating to the unjust enrichment claim, the plaintiffs have not identified any case in which a court applied a theory of unjust enrichment to a lawsuit primarily relating to the infringement and/or appropriation of a person's trademark rights and privacy rights. Third, even if Sam Moore could otherwise establish the elements of an unjust enrichment claim, the claim essentially overlaps with the publicity and trademark claims, which are subject to the stringent requirements of the First Amendment. The "benefit" that Sam Moore claims to have conferred were his "trademarks and public persona," (Docket No. 340 at p. 47), which are precisely the rights he asserts were violated in his trademark and right of publicity claims. Thus, the court interprets the unjust enrichment claim as subject to the *Rogers* test, which Sam Moore cannot satisfy for the reasons described *supra*.

## VI.    <u>Conspiracy</u>

Aside from the evidentiary burden, claims for conspiracy under Tennessee law and Arizona law are substantially the same.

Under Tennessee law, a plaintiff must show: (1) a common design between two or more persons; (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by

unlawful means, (3) an overt act in furtherance of the conspiracy; and (4) resulting injury.

*Foster Bus. Park, LLC v. Winfree*, No. M2006-02340-COA-R3-CV, 2009 WL 113242, at *16 (Tenn. Ct. App. Jan. 15, 2009) (citing *Braswell v. Carothers*, 863 S.W.2d 722, 727 (Tenn. Ct. App. 1993)); *see also Baker ex rel. Hall Brake Supply, Inc. v. Stewart Title & Trust of Phoenix, Inc.*, 5 P.3d 249, 256 (Ariz. App. 2000) ("For a civil conspiracy to occur two or more people must agree to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, causing damages.")  A civil conspiracy requires an underlying predicate tort allegedly committed pursuant to the conspiracy.  *Foster Bus. Park*, 2009 WL 113242, at *16 (citing *Morgan v. Brush Wellman, Inc.*, 165 F. Supp. 2d 704, 721 (E.D. Tenn. 2001)); *Baker*, 5 P.3d at 259.  Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration.  *Freeman Mgm't Corp v. Shurgard Storage Ctrs., LLC*, 461 F. Supp. 2d 629, 642-43 (M.D. Tenn. 2006); *Watson's Carpet & Floor Covering, Inc. v . McCormick*, 247 S.W.3d 169, 186 (Tenn. Ct. App. 2007); *see also Dorsey v. Delcupp*, No. 1 CA-CV 08-0472, 2010 WL 475454, at *4 (Ariz. App. Feb. 11, 2010) ("Essentially, a civil conspiracy requires the conspirators to agree to commit an underlying tort.").

 To prove conspiracy under Arizona law, the plaintiffs must provide clear and convincing evidence.  *See Wells Fargo*, 38 P.3d at 37.  Under Tennessee law, the plaintiffs must only prove their case by a preponderance of the evidence.  *Stanfill*, 2007 WL 2827498, at *8.

 As an initial matter, because the court has found that the defendants are entitled to summary judgment on the underlying torts, the conspiracy claim must fail.  Nevertheless, even if one or more claims were to proceed to trial, the defendants would be entitled to summary

judgment on the conspiracy claim. With respect to the substance of the conspiracy claim, the defendants argue that the plaintiffs have not presented any evidence reflecting a conspiracy. Essentially, they argue that the parties were linked only by contractual agreements and that there was no collaboration with respect to the formation of the Movie's content. Indeed, MGM simply entered into a global distributorship agreement with TWC to distribute a number of movies, of which *Soul Men* was one among many; Genius Products distributed the *Soul Men* DVD pursuant to a standard distribution agreement relating to numerous DVDs, of which *Soul Men* was one; and Concord entered into an agreement with TWC to distribute the *Soul Men* Soundtrack after *Soul Men* was filmed.

In response, the plaintiffs do not identify any additional facts regarding MGM (the theater distributor) and Genius Products (the DVD distributor), simply stating that "[a]ll Defendants are implicated in the planning and execution of the production and distribution of the Movie, Soundtrack and DVD and the marketing of additional goods . . . ." (Pltfs. SJ Resp. at p. 45.) The fact that MGM distributed *Soul Men* in theaters and that Genius Products distributed the *Soul Men* DVD does not, standing alone, establish that they were part of a conspiracy to violate Sam Moore's rights. Furthermore, the plaintiffs did not even depose any witnesses from MGM or Genius. In the absence of any facts relating to a potential conspiracy involving MGM and Genius, the plaintiffs' conspiracy claim against MGM and Genius plainly fails as a matter of law, even under Tennessee's lower "preponderance of the evidence" standard.

With respect to Concord, the plaintiffs suggest that Concord and TWC colluded to promote Concord's efforts to relaunch the "Stax brand." The plaintiffs' theory in this regard is not well articulated. In 2005, Concord apparently purchased a company that possessed the rights

to many Stax recordings other than Sam & Dave recordings, which belonged to Atlantic Records. After Concord announced its intention to relaunch the Stax brand in March 2007, the prospective producer of *Soul Men* emailed a Concord official about the Movie project, which was likely to involve certain Stax recordings. Ultimately, the Movie producers chose not to purchase the rights to Atlantic's Sam & Dave masters, including "Soul Men," apparently because of cost concerns. The plaintiffs also note that the producers included Isaac Hayes in the film, even though he was very ill at the time; that the producers utilized "Hold On I'm Comin'" in promoting the Movie, and that Concord included an advertising insert stating that "The Original Soul Men Are At Stax."

It is unclear to the court how these disparate pieces of information are even relevant to a conspiracy claim against Concord and TWC. At any rate, they do not provide sufficient evidence from which a jury could conclude – even by a preponderance of the evidence – that TWC and Concord engaged in a common plan to commit a tort against Sam Moore. Accordingly, the court finds that the conspiracy claim against Concord and TWC fails as a matter of law, as well.

## CONCLUSION

For the reasons stated herein, the Motion to Exclude the Simson Report and Testimony will be granted, the Motion to Exclude the Benjaminson Report and Testimony will be granted, the Motion to Exclude the Chasser Declaration will be granted in part and denied in part, the Motion to Strike the  Moore Declaration will be granted in part and denied in part, and the Motion for Summary Judgment will be granted.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge